

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD85680 |
| | ) | |
| NANCY J. ROYAL, | ) | Opinion filed: October 22, 2024 |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF
### LIVINGSTON COUNTY, MISSOURI
### THE HONORABLE RICHARD BRENT ELLIOTT, JUDGE

Special Division: Alok Ahuja, Presiding Judge,
Mark D. Pfeiffer, Judge and W. Douglas Thomson, Judge

Nancy Royal appeals from the trial court's judgment convicting her of first-degree involuntary manslaughter, child neglect resulting in death, child abuse, and two counts of first-degree endangering the welfare of a child following a jury trial. Royal was sentenced to a total of 30 years' imprisonment. She brings three points on appeal. First, Royal argues there is insufficient evidence that she knowingly neglected her child and caused his death. Second, she argues there is insufficient evidence that she knowingly abused her other minor child by failing to educate her. Finally, Royal argues the trial court plainly erred in convicting her of both

involuntary manslaughter and child neglect resulting in death because her simultaneous conviction of both offenses violates Missouri's cumulative punishment statute. Finding no error, we affirm.

## I.      FACTUAL AND PROCEDURAL HISTORY[1]

We begin with a brief account of the startling facts of this case before commencing a detailed description of the evidence.

J.R.[2] was 11-years old and weighed 36 pounds when he died on February 9, 2019. He was 59 inches, nearly 5 feet tall, the day he died. J.R. had not seen a doctor since he was 22 months old, when he weighed 28 pounds. A pediatrician who reviewed the case stated that J.R. "looked like he came from a concentration camp, he was that thin." Police and paramedics discovered J.R. unresponsive – without a pulse and not breathing – on a bed after responding to a 911 call made regarding him. Based on his size, they estimated J.R. was approximately 6 years old. First responders testified to seeing "black" fluid resembling "coffee grounds" around J.R.'s mouth, on his clothes, and on the bedding around him that was later determined to be blood from his stomach. First responders who performed CPR on J.R. observed both the black fluid and a yellow foam coming from J.R.'s nose and mouth. After being pronounced dead at a hospital, an autopsy of J.R.

---

[1] "'On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict.'" *State v. Aldana*, 681 S.W.3d 586, 591 n.1 (Mo. App. W.D. 2023) (quoting *State v. Weyant*, 598 S.W.3d 675, 676 n.1 (Mo. App. W.D. 2020)).

[2] Pursuant to Section 509.520.1, we do not include the names of the minor victims or non-party witnesses and refer to them by initials when necessary.

determined his cause of death was diabetic ketoacidosis complicated by acute influenza. J.R. died wearing soiled, dirty clothes.

J.R. was Royal's son. Royal resided in the home with J.R.

V.R. was 9-years old when police officers encountered her in the home. Despite her age, V.R. told officers that she did not know the alphabet. She had never been to school. She could not read or write. V.R. told officers she did not know when her birthday was. She did not have a toothbrush.

V.R. was Royal's daughter. She resided in the home with Royal and J.R.

The house smelled strongly of urine and feces. Officers obtained and executed a search warrant and found piles of both animal and human feces throughout the house. One closet appeared to be used as a toilet and was full of feces and urine. The kitchen contained dirty dishes and old and rotting food. The house was so dirty that the Children's Division investigator who responded to the home to interview V.R. had to step outside to be sick.

Because Royal challenges the sufficiency of the evidence for both Count II (child neglect resulting in J.R.'s death) and Count III (child abuse for failing to educate V.R.), we must set out the grim details which comprise the factual record.

### A.   J.R.'s illness and death

In the week leading up to J.R.'s death, most of his family contracted the flu. Each of the family members, including J.R., managed their flu symptoms at home without seeing a doctor. J.R. started experiencing flu-like symptoms on February 6, 2019. J.R. was sick for approximately three days before he passed.

V.R. testified at length about J.R.'s illness leading up to his death. According to V.R., Royal was either sleeping in her room or drinking vodka while J.R. was sick. V.R. stated that J.R. "had been sick for a really long time" and "that he begged for something to eat and especially begged for soda." V.R. also stated that food and soda would make J.R. "sicker" so her parents would not give him food or soda. J.R. "kept throwing up this weird, like, blackish stuff, and sometimes he would throw up, like, this red stuff." J.R. could not get up to go to the bathroom and would soil himself in the bed. No one changed the sheets. V.R. would sometimes help J.R. to the bathroom. J.R.'s older brother testified that he also helped J.R. to the bathroom while he was sick. J.R. also told V.R. shortly before he died that he was unable to hear. V.R. also saw J.R. speak to someone who was not there before he died. Shortly before J.R. died, he lost the ability to speak.

Royal testified that she was unaware that J.R. was so sick that he was unable to walk. This, despite the fact that Royal had previous training as a certified nursing assistant. Royal believed she could effectively manage J.R.'s illness at home. She discovered J.R. was not breathing in the early morning hours of February 9, 2019 and began CPR. Royal's husband called 911, but V.R. stated that Royal was unhappy that emergency services had been contacted and stated, "I don't want them to come. I can handle it."

First responders, including police, arrived at the Royals' residence around 3:30 a.m. on February 9, 2019. They smelled alcohol coming from Royal. Royal and her husband both acknowledge that Royal is an alcoholic. Royal's husband

4

described her as "belligerent" toward the first responders who were tending to J.R. Royal was uncooperative, angry, and loud with police officers who responded to the scene. Royal did not immediately leave to follow J.R. to the hospital, despite repeated urges from first responders, and did not arrive at the hospital until an hour and a half after J.R. was taken by ambulance.

An autopsy was performed on J.R., which revealed he died of diabetic ketoacidosis complicated by acute influenza. First responders had tested J.R.'s blood glucose levels when assessing him and found his glucometer reading was over 600. The glucometer used by first responders does not give readings above 600, so J.R.'s exact blood glucose level is unknown.

Three experts testified at Royal's trial about J.R.'s medical condition and cause of death. The State offered a pediatrician ("State Pediatrician") and the medical examiner who conducted J.R.'s autopsy ("Medical Examiner"). Royal offered her own expert: a pediatrician and pediatric infectious disease doctor ("Defense Pediatrician").

**State Pediatrician**

The State Pediatrician works with the State Technical Assistance Team (STAT), which investigates allegations of child abuse. The State Pediatrician had worked his entire career in pediatrics, including diagnosing children with Type I diabetes. He estimated that in his career, he had diagnosed "well over a hundred, and probably close to 200" children with Type I diabetes. The State Pediatrician reviewed the following records relating to J.R.'s death: the police report, the

5

EMT/paramedic report from the 911 call through the arrival at the hospital, all of J.R.'s records from Pershing Memorial Hospital in Brookfield, which included a visit at 22 months old and the visit where he died, the postmortem report from the doctor who performed J.R.'s autopsy, photographs taken during the investigation at J.R.'s home, photographs taken during J.R.'s autopsy, and photographs taken during J.R.'s hospitalization where he was pronounced dead.

The State Pediatrician testified at length about Type I diabetes. Type I diabetes presents in several ways, but "typically children are well and then they get a minor viral illness, an upper respiratory infection, a little GI bug … [a]nd kids go from literally being well to critically ill within two or three days typically." When a child with *undiagnosed* Type I diabetes contracts a minor illness, including the flu, their immune system creates antibodies to kill the germs making them sick and "in that manufacturing process…an autoantibody is formed incorrectly and it attacks the body's pancreas…where our insulin is made." Children with Type I diabetes can also present with the "three P's," which the State Pediatrician described as (1) polyphagia (increased hunger without gaining weight), (2) polydipsia (increased thirst), and (3) polyuria (increased urination).

Children with undiagnosed Type I diabetes can experience weight loss – typically between 10 and 12 percent of their body weight. Any more weight loss is considered "rapid" and "is going to cause shock in the system and ultimately a cardiovascular collapse." Children diagnosed with Type I diabetes must monitor and manage the condition for the rest of their lives, and often spend time in the

hospital after they are diagnosed to learn to manage the condition. With proper management, those with Type I diabetes "can live well on into adulthood."

The State Pediatrician also testified about the importance of regular "well checks" during childhood. The standard schedule for well checks is, according to the child's age: two weeks, one month, two months, four months, six months, nine months, 12 months, 15 months, 18 months, 24 months, 30 months, 36 months, and then yearly after the child's third birthday. In a child's first two years, their pediatrician is tracking their weight, development, screening for various chronic conditions, and providing immunizations. According to the State Pediatrician, "growth is our most sensitive parameter that we follow for good health." "If we see a child dipping down on the growth curve, that kind of brings to our attention there may be an underlying disease that's causing this, and we may not see it at that visit. It sometimes could take several years to manifest."

In the State Pediatrician's opinion, J.R. had undiagnosed Type I diabetes at the time of his death. The State Pediatrician's opinion is based on several factors. First, J.R. had a minor viral illness – Influenza A – shortly before his death. Second, J.R.'s blood glucose level shortly before he died was over 600, and his blood glucose level during the autopsy was over 500, despite such level dropping every hour after a person dies and the autopsy being performed the day after J.R. died. A normal blood glucose reading is 99 or lower. J.R.'s ketone levels were also measured during the autopsy and revealed that J.R. was in diabetic ketoacidosis

7

when he died.[3] The State Pediatrician testified that a high blood glucose level "leads to the ketoacidosis, and the ketoacidosis causes death if not treated."

The State Pediatrician also testified that J.R. was experiencing a "failure to thrive," which indicates "chronic malnutrition," based on his low weight compared to his height.  Based on his height at the time of his death, 59 inches, and assuming that his healthy weight would have placed him in the 75th percentile on his growth chart, J.R. should have weighed between 90 and 106 pounds at 11 years old, rather than his actual weight of 36 pounds.  The State Pediatrician described J.R. from the autopsy photos: "He looked like he came from a concentration camp, he was that thin."  The State Pediatrician opined, "Being malnourished decreases your immune response, which makes you a little more prone to getting sick.  And, also, if you do get sick, because your immune system is compromised, you're more likely to have a secondary complication."  The State Pediatrician also testified that the black substance J.R. was vomiting before his death was blood and stomach acid from hemorrhagic gastritis – a condition causing severe bleeding in the stomach – which was found during his autopsy.

Finally, the State Pediatrician opined that J.R. died due to medical neglect. The State Pediatrician also testified that if Royal had taken J.R. to the doctor prior to his cardiac arrest, J.R. had a chance of surviving.

---

[3] Ketones are produced by breaking down fat.  In diabetics, when insulin is not present in the body, the body begins "tearing down fat" and producing ketones.

**Medical Examiner**

The Medical Examiner who performed J.R.'s autopsy also testified during the State's case-in-chief. In his report, the Medical Examiner described J.R. as "cachectic" and with "atrophic musculature," meaning J.R. was incredibly thin due to disease at the time of his autopsy. The Medical Examiner stated that atrophic musculature is caused by a lack of nutrients to the body. The Medical Examiner noted that J.R.'s teeth showed poor hygiene. J.R.'s throat had vomit in it, and his stomach was "hemorrhagic." J.R.'s lung tissue was cultured for various organisms and was positive for Influenza A. The Medical Examiner also tested J.R.'s glucose level and found it was greater than 500 at the time of the autopsy. The lab that tested J.R.'s glucose could not give a value above 500. J.R.'s glucose level, combined with his level of isopropanol and acetone, indicate that J.R. was in a state of diabetic ketoacidosis when he died.

The Medical Examiner agreed with the State Pediatrician that J.R. had undiagnosed Type I diabetes at the time of his death. The Medical Examiner also agreed that J.R.'s flu was likely a "stressor" that caused the diabetic ketoacidosis "to get far worse fairly quickly." The Medical Examiner also testified that J.R.'s cause of death was diabetic ketoacidosis complicated by influenza.

**Defense Pediatrician**

The defense also offered an expert pediatrician who specializes in pediatric infectious disease. The Defense Pediatrician reviewed J.R.'s autopsy, toxicology and lab results related to the autopsy, the State Pediatrician's report, and "four or

9

five" other reports. The Defense Pediatrician did not review J.R.'s prior medical records.

The Defense Pediatrician testified that J.R.'s weight loss would have begun six months to a year prior to his death, given the discrepancy between his height and weight when he died. If Royal had taken J.R. to a pediatrician for routine medical care, a pediatrician would have noticed his weight loss. The Defense Pediatrician agreed that J.R. had diabetes prior to his death, and that contracting the flu worsened J.R.'s diabetic ketoacidosis. Like the other experts, the Defense Pediatrician noted that diabetes is a controllable disease with treatment.

However, the Defense Pediatrician opined that J.R. died due to bacterial sepsis. If J.R. had been taken to a doctor when he began showing symptoms, he could have been helped. The Defense Pediatrician acknowledged that J.R.'s death was complicated by the flu, emaciation, dehydration, and diabetic ketoacidosis. The Defense Pediatrician also conceded that diabetic ketoacidosis could have killed J.R. and that J.R.'s undiagnosed diabetes would have weakened his immune system over time.

### B.    V.R.'s living conditions and education

The jury convicted Royal of first-degree child endangerment for V.R.'s living conditions. Royal was also convicted of child abuse for failing to educate V.R., who at nine years old, was unable to read or write, did not know her alphabet or her own birthday, could not brush her own hair or bathe by herself.

**V.R.'s living conditions**

V.R. was 9-years old and at home when her brother died. V.R. was taken into protective custody after first responders were "[e]xtremely concern[ed]" by the state of the Royals' home. Feces, dirt, and piles of trash covered the floor throughout the home. The house smelled so strongly of feces and urine that the Children's Division investigator who initially responded to the home vomited in the front lawn. The Royals kept multiple animals in the house, including 15 birds, four dogs, three snakes, two turtles, and a cat. There were also mice in the house, although they were not pets. First responders noted the pillows and sheets were "gray, almost black." The kitchen contained dirty dishes and rotting food.[4]

Royal stayed home with V.R. and J.R. while her husband and adult son went to work each day. Royal's husband and adult son worked approximately 5 a.m. to 8 p.m. V.R. reported the house was always dirty and it was her job to clean it. Royal's husband confirmed that when he returned from work, "the house would be trashed."[5]

V.R. had only been to a doctor once, shortly after she was born. V.R. stated that Royal did not cook and would not prepare breakfast or lunch for V.R. or J.R. V.R. would serve food to Royal and learned to make coffee for Royal. V.R. was responsible for preparing lunch for herself and J.R. and would often "put a pizza in the microwave or something." V.R. also told her first foster mother that she

---

[4] Photos of the home were admitted into evidence and published to the jury.
[5] Royal's husband invoked his Fifth Amendment right to not testify at her trial. His testimony was admitted via deposition.

sometimes had to "fight the dogs" for her food. V.R. reported that they did not have food in the refrigerator at home.

V.R. was removed from the Royal home the same day J.R. died and was placed with a foster family. V.R.'s first foster mother testified that V.R. came to her home in clothes that were so dirty they were "hard" to the touch; V.R.'s hair was a "tangled-mess," and V.R. had head lice; and V.R. was overall dirty. V.R. stated that her father helped her bathe once a month to every five weeks in cold water. V.R. also stated the family shared a hair brush and did not own any toothbrushes. V.R.'s first foster mother had to buy her clothes and help V.R. bathe, because V.R. did not know how to bathe herself. V.R. also stated that she was not potty trained until the year prior to her brother's death.

V.R. did not learn of J.R.'s death for weeks because the Royals did not tell V.R. Instead, V.R. believed that J.R. was recovering in the hospital "because he had been sick; he hadn't been fed in a while."

### V.R.'s education

V.R. told her first foster placement that she was supposed to be homeschooled but that her parents "never [did] too much work with her." Royal continued to object to V.R. attending public school after V.R. was placed in protective custody, but eventually a judge ordered V.R. to attend public school. Before starting school, V.R. could not read. Each of V.R.'s foster placements stated that V.R. was eager to learn and would complete workbooks without prompting.

12

V.R. was tested for placement in public school. V.R. was old enough to be a third-grader but her highest testing score placed her in the first grade. V.R. was placed in a third-grade class to be around her peers and received one-on-one instruction during the school day.

V.R.'s caseworker described V.R. as "a very happy-go-lucky child" with "a great outlook" who "smiles a lot." Both V.R.'s caseworker and her foster families reported that V.R. enjoyed school and interacting with her peers and teachers. V.R. progressed quickly and caught up to grade level by the end of her first semester of school. V.R.'s foster mother, who cared for V.R. for nearly three years, stated that when V.R. initially began school, she "didn't like weekends because they weren't going to school."

At the time of trial, V.R. had completed the fifth grade as a straight-A student and was involved in musical theater and basketball. At the time of trial, V.R. was placed with a prospective adoptive family and enjoyed swimming, riding her bike, and working in the family's garden. V.R. reported to her caseworker that she wanted to be a teacher or a counselor in the future.

Royal was convicted by a jury of first-degree involuntary manslaughter (Count I) for J.R.'s death, neglect of a child resulting in death regarding J.R.'s death (Count II), abuse of a child for failing to educate V.R. (Count III), and two counts of first-degree endangering the welfare of a child (Counts IV and V) for J.R. and V.R. respectively. The trial court sentenced her to a total of 30 years' imprisonment. This appeal follows.

## II.     STANDARD OF REVIEW

Royal's first two points challenge the sufficiency of the evidence. The Missouri Supreme Court has outlined the standard of review for a sufficiency of evidence claim:

> An appellate court's review of the sufficiency of the evidence to support a criminal conviction is limited to determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). All evidence and inferences favorable to the State are accepted as true, and all evidence and inference to the contrary are rejected. *State v. Stover*, 388 S.W.3d 138, 146 (Mo. banc 2012). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder 'could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011) (quoting *State v. Bateman*, 318 S.W.3d 681, 686-87 (Mo. banc 2010)).

*State v. Porter*, 439 S.W.3d 208, 211 (Mo. banc 2014).

Royal acknowledges that her third point is not preserved for this Court's review, and she is requesting plain error review. We discuss plain error review below.

## III.     ANALYSIS

### A.     POINT I

In her first point, Royal argues that "there was insufficient evidence to show [Royal's] knowing failure to provide routine medical care generally and medical care in the three days before [J.R.'s] death caused the physical injury that resulted in [J.R.'s] death." Essentially, Royal argues that she "could not have known that

14

J.R.'s] minor symptoms, if she noticed, would have caused a reasonable person to seek medical care." Royal also argues the State was required "to prove [Royal's] neglect caused diabetes or the resulting diabetic ketoacidosis." We disagree.

Section 568.060 criminalizes child abuse and neglect. Section 568.060.2 states:

> A person commits the offense of abuse or neglect of a child if such person knowingly causes a child who is less than eighteen years of age:
>
> (1) To suffer physical or mental injury as a result of abuse or neglect; or
>
> (2) To be placed in a situation in which the child may suffer physical or mental injury as the result of abuse or neglect.

Abuse or neglect is a Class A felony if the child dies as a result of the injuries "sustained from conduct chargeable under provisions of" Section 568.060. *See* Section 568.060.5(2).

"Neglect" is defined as "the failure to provide, by those responsible for the care, custody, and control of a child under the age of eighteen years, the care reasonable and necessary to maintain the physical and mental health of the child, when such failure presents a substantial probability that death or physical injury or sexual injury would result." Section 568.060.1(4).

"Physical injury" is defined as "physical pain, illness, or any impairment of physical condition, including but not limited to bruising, lacerations, hematomas, welts, or permanent or temporary disfigurement and impairment of any bodily function or organ." Section 568.060.1(5).

15

The jury was instructed as follows for Count II:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about February 9, 2018 to February 9, 2019, in the State of Missouri, the defendant knowingly caused J.R. to suffer physical injury, and

Second, that the physical injury suffered was the result of the defendant not providing routine health care and not seeking medical treatment for J.R.'s acute illness, and

Third, that defendant thereby failed to provide the care reasonable and necessary to maintain the physical and mental health of J.R., and

Fourth, that defendant was responsible for the care, custody, and control of J.R., and

Fifth, that defendant's failure presented a substantial probability that death would result, and

Sixth, that J.R. was then less than eighteen years old, and defendant knew that J.R. was less than eighteen years old, and

Seventh, that J.R. died as a result of injury sustained from defendant's conduct,

[T]hen you will find the defendant under Count II of neglect of a child.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

As used in this instruction, the term "physical injury" means physical pain, illness, or any impairment of physical condition, including but not limited to bruising, lacerations, hematomas, welts, or permanent or temporary disfigurement and impairment of any bodily function or organ.

Royal divides her arguments in two, first discussing why the evidence was insufficient to prove that Royal neglected her son by failing to take him for routine medical care. Second, Royal argues that there was insufficient evidence to find that

16

Royal neglected her son by failing to seek medical care for his acute illness in the days before his death. We address each in turn.

First, Royal argues that there was no expert testimony that failing to take a child to routine doctor visits does not present a substantial probability that death or physical injury would result. We disagree. The State presented evidence that J.R. required routine medical care and that failing to provide him with such created a substantial probability that death or physical injury would result.

*Every* expert who testified, *including* the Defense Pediatrician, agreed that J.R. had undiagnosed Type I diabetes at the time of his death. Each also agreed that Type I diabetes is an autoimmune disease that can be complicated by a minor illness: in J.R.'s case, the flu. Each expert acknowledged that diabetic ketoacidosis is a complication of uncontrolled Type I diabetes and can occur when an individual with Type I diabetes contracts a minor illness.

Further, the jury heard evidence that, had J.R. received recommended routine medical care, a clinician would have noticed his extreme weight loss, which would have prompted further investigation into his health. The State Pediatrician testified that weight is a significant indicator of health in children. Both the State and Defense Pediatricians stated that, because J.R.'s weight loss was significant, it would have taken place over months to a year and a half. Specifically, the Defense Pediatrician testified that, if J.R. had been seen regularly by a clinician, a clinician would have noticed his weight loss and could have investigated its cause. Both pediatricians acknowledged that weight loss is a symptom of Type I diabetes. All

17

three experts testified that diabetes is a "controllable" disease with medical intervention, and that diabetic ketoacidosis is treatable. Further, the expert testimony indicates that diabetic ketoacidosis is a complication arising from *uncontrolled* diabetes.

The jury also heard evidence regarding J.R.'s severely emaciated state at the time of his death. Despite being 11 years old at the time of his death, several first responders testified that they estimated J.R. to be around 6 years old at the time of his death based on his size. The State Pediatrician stated that J.R. "looked like he came from a concentration camp, he was that thin." Based on J.R.'s age and prior weight, he should have weighed between 90 and 106 pounds at the time of his death, and instead weighed a mere 35 pounds. J.R.'s size and physical state alone should have prompted Royal to investigate his health.

Therefore, the jury heard sufficient evidence that J.R. had a controllable disease that went untreated because Royal neglected to take J.R. to regular doctor's appointments or investigate the cause of the symptoms evident long before his death. The jury heard evidence from all of the experts that J.R. was showing symptoms months prior to his death – notably his extreme weight loss – that, if he had seen a physician, could have been investigated and treated. The jury also heard evidence that J.R. died from conditions that are treatable.

Royal also argues that the State bore the burden to prove that Royal's "neglect caused diabetes or the resulting diabetic ketoacidosis."[6] We disagree. Section 568.060.2 states that a person commits child neglect if they knowingly cause a child "[t]o suffer physical or mental injury as a result of abuse or neglect." "Physical injury" is defined as "physical pain, illness, or any impairment of physical condition, including but not limited to bruising, lacerations, hematomas, welts, or permanent or temporary disfigurement and impairment of any bodily function or organ." Section 568.060.1(5). In Royal's case, the State was required to prove that she failed to take steps to address J.R.'s obviously declining physical health. The statute does not, as Royal argues, require the State to prove that Royal's actions *caused* J.R.'s diabetes. In this case, the jury heard sufficient evidence, as explained above, that J.R. was displaying symptoms of a serious illness for months prior to his death. The evidence also demonstrated that, if Royal had taken J.R. to a doctor, a doctor would have recognized J.R.'s symptoms as requiring treatment. J.R. died from a treatable complication of his undiagnosed but treatable condition. The jury heard evidence that if J.R. received treatment even in the months leading up to his death, J.R. would have survived.

---

[6] At times, Royal argues that even if she had taken J.R. to a doctor prior to his death, "it is not clear [J.R.] would have had diabetes yet to test positive for." Such an argument is directly contradicted by all of the expert testimony at trial, including the Defense Pediatrician's testimony. The Defense Pediatrician testified that, based on J.R.'s symptoms and weight loss, he had Type I diabetes prior to contracting the flu and developing diabetic ketoacidosis. As such, Royal's argument ignores the uncontradicted expert evidence from the trial.

Second, the jury also heard sufficient evidence that J.R.'s condition was worsening in the days leading up to his death. Royal acknowledges that J.R. "started to show serious signs of diabetic ketoacidosis less than a week before his death," including "persistent drowsiness, rapid breath, weakness, and rapid weight loss." The jury heard evidence that J.R. was too weak to walk and lost his ability to talk and hear prior to his death. Before J.R. stopped breathing, he was throwing up blood. Royal testified that she was not aware that J.R. could not walk until after his death, because she rarely went upstairs and J.R. spent several days of his acute illness upstairs. In other words, Royal acknowledges that she did not know the severity of J.R.'s condition because she did not actively monitor her sick child. V.R. testified that Royal spent most of J.R.'s acute illness drinking vodka, and first responders also testified that Royal was visibly drunk when they responded to the home after J.R. stopped breathing.

Rather than arguing that J.R. was not displaying symptoms severe enough to indicate to Royal that J.R. needed immediate medical care, Royal argues that "[t]he problem [with the State's case] is once these more serious symptoms started to show[,] the 'physical injury' had already occurred. Again, the 'physical injury' that resulted in [J.R.'s] death was diabetic ketoacidosis." Royal's argument ignores the testimony of her own expert at trial: that diabetic ketoacidosis "may kill a child, if not treated," and that only "two percent" of those who develop diabetic ketoacidosis will die.

20

In other words, the jury heard evidence that diabetic ketoacidosis rarely results in death but may kill a child *if left untreated*. Royal concedes that J.R. was displaying serious symptoms prior to his death and that she was unaware of the full extent of J.R.'s illness. The jury had sufficient evidence to determine that Royal's neglect of J.R. in the days prior to his death caused him to die from an otherwise treatable condition.

Royal spends a considerable amount of her argument discussing *State v. Baker*, 618 S.W.3d 551 (Mo. App. E.D. 2020). In *Baker*, the appellant was convicted of abuse or neglect of a child after she gave birth to her extremely premature infant at home and did not seek medical care for her infant, who died two days after he was born. *Id.* at 552-53. The State's medical expert, who performed an autopsy on the infant, determined the infant's cause of death "was complications of prematurity." *Id.* at 553. The Eastern District reversed her conviction, finding the evidence was insufficient to convict the appellant of child abuse or neglect because the State's medical expert did not testify that the appellant's failure to seek medical care for her infant caused his death. *Id.* at 558. The Eastern District stated, "without medical testimony, we cannot conclude that but for Appellant's failure to seek medical treatment, [the infant] would not have suffered the same physical injuries." *Id.* Therefore, there was no evidence that "'permit[ed] a reasonable inference that the cause of [injury and death] was a criminal act, and was not instead a natural peril of child birth.'" *Id.* at 559 (quoting

*State v. Usnick*, 585 S.W.3d 298, 306 (Mo. App. W.D. 2019)).[7]  In other words, the Eastern District determined the evidence was insufficient because there was no evidence that the infant would not have died even if the appellant had obtained medical care for her infant after the infant was born. *Id.*

The evidence in this case differs significantly from that in *Baker*.  The State in *Baker* failed to present sufficient evidence because there was no evidence that the infant would have survived even with medical intervention.  As explained above, the jury in this case heard evidence from several experts that J.R. died from a treatable complication – diabetic ketoacidosis – of a controllable disease – Type I diabetes.  The jury also heard evidence that J.R. was displaying symptoms for, at a minimum, months prior to his death and that, if J.R. had been seen by a physician, a physician would have recognized the need to investigate J.R.'s condition further.

The jury had sufficient evidence to convict Royal of child neglect resulting in J.R.'s death.  Point I is denied.

---

[7] The Eastern District discussed the nuances in providing sufficient evidence to convict a mother of an injury her child sustained during childbirth at length in *Baker*.  For example, the *Baker* court pointed out that "mothers cannot be prosecuted for indirect harm caused to their unborn child by ingesting illegal drugs during pregnancy." *Id.* at 556 (citing *State v. Wade*, 232 S.W.3d 663, 665 (Mo. App. W.D. 2007).  Further, the *Baker* court pointed out that a "'medically unattended delivery of [an infant] cannot support criminal prosecution as a matter of law.'" *Id.* (quoting *Usnick*, 585 S.W.3d at 305).  Such precedents clearly affected the *Baker* court's decision, as the court stated in part, "While [the medical expert] stated with confidence that E.B.'s injuries and death were due to extreme prematurity, potentially brought about by Appellant's methamphetamine use, this Court cannot consider Appellant's actions before the baby's birth." *Id.* at 558.  Obviously, such nuances, which were highly probative to the analysis in *Baker*, are not relevant to this case.

## B.    POINT II

In her second point, Royal argues that there was insufficient evidence to convict her of abusing V.R. because "the failure to educate one's child can never constitute 'abuse'" under the plain language of Section 568.060.  Royal argues that "abuse" requires the intentional infliction of an injury, and the failure to do something can never be "abuse."  Instead, Royal contends that the failure to act is only ever "neglect" as defined by Section 568.060.

A person commits child abuse when they knowingly cause a child to suffer a "mental injury as a result of abuse." Section 568.060.2(1).  Section 562.016.3(2) states that "[a] person 'acts knowingly...' with respect to a result of his or her conduct when he or she is aware that his or her conduct is practically certain to cause that result."

Section 568.060.1(1) defines "abuse" as "the infliction of physical, sexual, or mental injury against a child by any person eighteen years of age or older."  Abuse does not include "injury inflicted on a child by accidental means...or discipline of a child...including spanking, in a reasonable manner." *Id.*  "Mental injury" is defined as "an injury to the intellectual or psychological capacity or the emotional condition of a child as evidenced by an observable and substantial impairment of the ability of the child to function within his or her normal range of performance or behavior." Section 568.060.1(3).

The jury was instructed as to Count III:

23

As to Count III, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about between February 9, 2018 and February 9, 2019, in the State of Missouri, the defendant knowingly caused V.R. to suffer mental injury, and

Second, that the mental injury suffered was the result of abuse by the defendant failing to educate V.R., and

Third, that V.R. was less than eighteen years old, and defendant knew that V.R. was less than eighteen years old, and

Fourth, the defendant was eighteen years or older,

then you will find the defendant guilty under Count III of abuse of a child. However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

As used in this instruction, the term "abuse" means the infliction of physical, sexual, or mental injury against a child by any person eighteen years or older. Abuse shall not include injury inflicted on a child by accidental means by a person with care, custody, or control of the child, including spanking, in a reasonable manner.

As used in this instruction, the term "mental injury" means an injury to the intellectual or psychological capacity or the emotional condition of a child as evidenced by an observable and substantial impairment of the ability of the child to function within his or her normal range of performance or behavior.

Royal argues that the State alleged she "committed the affirmative act of abuse by neglecting or failing to act.... This can never be a crime because [S]ection 568.060 does not support the [sic] failing to act can ever constitute 'abuse.' Because the State alleged [Royal] 'abused' [V.R.] by failing to act, they were required to prove a factual impossibility, and, therefore, there was insufficient evidence."

24

Royal's argument is centered on Section 568.060's use of the word "infliction," which is undefined by the statute. Royal argues that "infliction" should be read as requiring an affirmative act. As such, we are required to interpret Section 568.060.

"'The primary rule of statutory interpretation is to give effect to the legislative intent as reflected in the plain language of the statute." *State v. Knox*, 604 S.W.3d 316, 320 (Mo. banc 2020) (quoting *State v. Salazar*, 236 S.W.3d 644, 646 (Mo. banc 2007)). "If a term is not defined by statute, we look to the dictionary for its plain and ordinary meaning." *Show-Me Inst. v. Office of Pub. Admin.*, 645 S.W.3d 602, 609 (Mo. App. W.D. 2022) (citing *Hegger v. Valley Farm Dairy Co.*, 596 S.W.3d 128, 131-32 (Mo. banc 2020)). "'When the words of the statute are clear, further interpretation is unnecessary, and the Court's analysis consists of applying the plain meaning of the law to the case before it.'" *LaBlance v. Dir. of Revenue*, 658 S.W.3d 505, 511-12 (Mo. banc 2022) (quoting *Bartlett Int'l Inc. v. Dir. of Revenue*, 487 S.W.3d 470, 473 (Mo. banc 2016)). "This Court will not add words to a statute under the auspice of statutory construction." *Macon Cty. Emergency Servs. Bd. v. Macon Cty. Comm'n*, 485 S.W.3d 353, 355 (Mo. banc 2016).

"Inflict" is defined as "to lay (a blow) on: cause (something damaging or painful) to be endured." *Inflict*, WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED (2002). By its plain and ordinary meaning, Section 556.060 therefore requires the State to prove that Royal knowingly inflicted – or caused

25

V.R. to endure – a mental injury. We will not add words not included in Section 556.060, and thus reject Royal's argument that we must read Section 556.060 as requiring the State to prove Royal committed an "affirmative act" to sustain her conviction for child abuse.

The jury had sufficient evidence to determine that Royal knowingly inflicted V.R. with a mental injury by failing to educate V.R. First, the jury heard evidence that Royal had homeschooled her older children, who were adults when J.R. died, but did not give J.R. and V.R. the same treatment. The jury heard Royal's husband's deposition testimony, where he stated that Royal purchased curriculums for the older children and also used college education materials to homeschool their older children. Royal's husband stated that Royal did not homeschool V.R. and J.R. because she began drinking. Royal's husband stated that he "rarely" saw Royal attempt to educate V.R. or J.R., and in the rare times she helped the children, it was because the children asked for her help. Royal's husband stated one of his older daughters tried to help with V.R. and J.R.'s education "as best she could."

V.R. testified at trial that Royal drank both during the day and "almost all night." V.R. testified that, even after J.R. died and she went to live with a foster family, Royal did not want her to attend school. When V.R. went into foster care, she could not read or write, and she told one foster parent that her parents never did much school work with her.

In short, the jury heard sufficient evidence at trial to conclude that, even though Royal had previously actively homeschooled her older children and thus presumably could have homeschooled V.R. and J.R., she chose not to engage in any homeschooling activities with V.R. Royal now tries to frame this decision as a "failure to act" rather than a decision Royal actively made. However, testimony from Royal's husband, V.R., and V.R.'s foster families confirms that Royal *knew* how to procure resources to homeschool V.R., and *could* actively engage in homeschooling; she simply chose not to do so. Royal was aware that V.R. had no other means to receive an education because, even after J.R.'s death, Royal actively rejected attempts to send V.R. to school. Royal was so persistent in denying V.R. an education that a judge eventually intervened and ordered that V.R. attend school. As such, the jury had sufficient information to determine that Royal knowingly inflicted – caused V.R. to suffer – a mental injury.

Royal does not contest that V.R.'s substantial educational deficits could be considered a "mental injury" within the meaning of Section 568.060.1(3), and we do not separately address the matter. The evidence was plainly sufficient for the jury to find that those educational deficits were caused by Royal's decision to withhold V.R. from the public schools, and her further choice not to provide V.R. with appropriate homeschooling instruction and materials. V.R. had *never been* to school before and, despite being nine years old when she began school, could not read, write, or count beyond 120. V.R. was placed in a third-grade classroom to be around peers her own age and received additional tutoring outside of her

27

regular classroom. Despite V.R.'s educational deficits, V.R. caught up to her peers *within a single semester*. At the time of trial, V.R. had just completed the fifth grade and received straight As. V.R.'s case worker testified that, despite what she had been through, V.R. is "a very happy-go-lucky child" who has "a great outlook." V.R.'s foster families testified that V.R. loved school and would have attended school even on the weekends if she had the option. At the time of trial, V.R. was participating and enjoying extracurricular activities through her school, like musical theater and basketball.

Such evidence is sufficient for a jury to determine that Royal's decision to not homeschool V.R. caused her mental injury by substantially impairing her ability to function within her normal range of ability. Evidence presented at trial demonstrates that V.R. is capable of performing well academically and enjoys school. Such evidence is sufficient for a jury to determine that V.R.'s ability to function at her normal intellectual abilities was substantially impaired by Royal's decision to forgo any sort of education for V.R., and as a result harmed V.R.

In sum, the jury heard sufficient evidence to determine Royal knowingly inflicted V.R. with a mental injury by failing to educate her. Point II is denied.

## C.    POINT III

In her final point, Royal argues her convictions for both involuntary manslaughter and child abuse resulting in J.R.'s death violate Missouri's prohibition for multiple convictions for multiple offenses when "[t]he offenses

differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct."

Royal concedes that she did not preserve this point for appeal and thus seeks plain error review. Plain error review is discretionary and governed by Rule 30.20. *State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020). "The plain error rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for review." *State v. Jones*, 427 S.W.3d 191, 195 (Mo. banc 2014).

"Plain error is evident, obvious and clear error." *State v. Bailey*, 839 S.W.2d 657, 661 (Mo. App. W.D. 1992). "A determination of whether plain error exists must be based on the consideration of the facts and circumstances of each case." *State v. Williams*, 858 S.W.2d 796, 798 (Mo. App. E.D. 1993). "Unless manifest injustice or a miscarriage of justice is shown, an appellate court should 'decline to review for plain error under Rule 30.20.'" *Brandolese*, 601 S.W.3d at 526 (quoting *State v. Jones*, 427 S.W.3d 191, 196 (Mo. banc 2014)).

We decline to exercise plain error review here. As Royal acknowledges, her argument requires this Court to ignore the vast majority of Missouri case law regarding Section 556.041(3). By so conceding, Royal acknowledges that she is not asking this Court to review an "evident, obvious, and clear error."

"Section 556.041 expresses the Missouri legislature's general intent regarding cumulative punishments, permitting prosecution of multiple offenses for the same conduct with four exceptions." *State v. Alexander*, 505 S.W.3d 384,

29

397 n.9 (Mo. App. E.D. 2016). "Section 556.041 provides that when the same conduct by a person may establish the commission of more than one offense, the person may be prosecuted for each offense, with four exceptions." *State v. Walker*, 352 S.W.3d 385, 388-89 (Mo. App. E.D. 2011).

The four exceptions are listed numerically in Section 556.041. Royal's argument directs us to the third exception, which states:

> When the same conduct of a person may establish the commission of more than one offense he or she may be prosecuted for each such offense. Such person may not, however, be convicted of more than one offense if:
>
> …
>
> (3) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or

Missouri courts have implemented the "same-element" test enunciated in *Blockburger v. United States*, 284 U.S. 299 (1932) in applying Section 556.041(3).[8]

---

[8] The Missouri Supreme Court has described the *Blockburger* same element test as follows:

> The proper test for assessing whether successive prosecutions violate double jeopardy is the *Blockburger* test, also known as the "same-elements" test. *United States v. Dixon*, 509 U.S. 688, 704, 113 S.Ct. 2849 125 L.Ed.2d 556 (1993). The *Blockburger* same-elements test asks "whether each offense contains an element not contained in the other; if not, the Double Jeopardy Clause bars a successive prosecution." *State v. Burns*, 877 S.W.2d 111, 112 (Mo. banc 1994). Given this formulation of the same-elements test, it follows that double jeopardy applies to lesser-included offenses and generally bars successive prosecutions involving lesser-included offenses. *See Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); section 556.041.1. The focus is on the elements of the offenses at issue, not the underlying conduct that resulted in the defendant being charged. *Dixon* at 704, 113 S.Ct. 2849.

*State v. Daws*, 311 S.W.3d 806, 808 (Mo. banc 2010).

30

"Where the elements of two offenses are separate and distinct, neither offense is a specific instance of the other and section 556.041(3) does not preclude convictions for both offenses." *State v. Porter*, 464 S.W.3d 250, 256 (Mo. App. E.D. 2015) (possession of a controlled substance with the intent to deliver does not preclude trafficking drugs in the second degree) (citing *State v. Hill*, 970 S.W.2d 868, 871 (Mo. App. W.D. 1998) (possession of a short barreled shotgun does not preclude armed criminal action as they are separate and distinct charges)); *see also State v. Dunn*, 7 S.W.3d 427, 429 (Mo. App. W.D. 1999) (stating sexual abuse is not a specific instance of forcible rape); *Alexander*, 505 S.W.3d at 398 (first degree murder does not preclude unlawful use of a weapon by firing at a motor vehicle and causing death as they are separate and distinct charges); *State v. Conner*, 583 S.W.3d 102, 114-15 (Mo. App. E.D. 2019) (sexual misconduct involving a child, attempted statutory rape, and attempted statutory sodomy do not preclude enticement of a child as they are separate and distinct charges); *State v. Burns*, 877 S.W.2d 111, 112 (Mo. banc 1994) (stating that Section 556.041 "appear[s] to codify the *Blockburger* [*v. United States*, 284 U.S. 299 (1932)] 'same-element' test.").

Royal concedes that her convictions for child neglect resulting in death and involuntary manslaughter each "contains an element the other does not" and thus her convictions do not violate *Blockburger* and by extension, Section 556.041(3). Thus, in light of the plethora of Missouri case law, Royal has not demonstrated she

31

suffered an "evident, obvious, and clear error" and is not entitled to plain error review.

Royal cites only one case to support her argument and that case has since been rejected by other Missouri courts. *See State v. Dailey*, 708 S.W.2d 220 (Mo. App. S.D. 1986). In *Dailey*, the court, in a break with all other Missouri courts that have addressed the issue, declined "to enunciate double jeopardy principles in disposing of" Dailey's arguments, which were based on Section 556.041(3). *Id.* at 221-22. Instead, the court determined that Dailey's convictions for both unlawful sale of a security and stealing by deceit violated Section 556.041(3) because the same *facts* were used to support both convictions. *Id.* at 222. The court's approach in *Dailey* was summarily rejected in a later case and has not been utilized by any Missouri court since. *See State v. Pilousek*, 747 S.W.2d 766, 769-70 (Mo. App. E.D. 1988) ("The language of [Section 556.041(3)] indicates that we must look to the language and interrelationship of the two statutes, not to the factual application of the statutes in a given case. A contrary analysis was apparently applied in *State v. Dailey*, 708 S.W.2d 220 (Mo. App. [S.D.] 1986) without explanation."). For the reasons described herein, we decline to follow *Dailey*.[9] Royal is not entitled to plain error review as there is no manifest injustice or miscarriage of justice shown.

Because Royal acknowledges that the elements of child neglect resulting in death and involuntary manslaughter are separate and distinct, the trial court did

---

[9] Because this opinion declines to follow this court's prior opinion in *Dailey*, the opinion has been reviewed and approved by order of the Court *en banc*. *See* S. Ct. Operating Rule 22.01; Mo. App. W.D. Special Rule 31.

not commit a "evident, obvious, and clear error."  Royal is not entitled to plain error review and her third point is denied.

### IV.  CONCLUSION

The trial court's judgment is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.