

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,      )
     )
         Respondent,     )
     )
v.          )     No.  SC93348
     )
SHARNIQUE N. JONES,      )
     )
         Appellant.     )

## APPEAL FROM THE CIRCUIT COURT OF ST. LOUIS COUNTY
The Honorable Colleen Dolan, Judge

### Opinion issued April 15, 2014

Sharnique N. Jones was convicted by a jury of second degree murder, second degree assault, and endangering the welfare of a child.  On appeal, she raises four points of error.  In her first three points, she claims the trial court erred in overruling her motions for judgment of acquittal on each offense for which she was convicted because there was insufficient evidence to support a finding of guilt beyond a reasonable doubt.  In her fourth point, Ms. Jones claims the trial court plainly erred in admitting into evidence statements she made to the police as evidence of guilt of murder in the second degree because the state failed to establish the *corpus delicti*.  Because the state presented evidence that sufficiently established the *corpus delicti* of the murder offense and because there was sufficient evidence from which a reasonable juror could find Ms. Jones guilty of each offense, this Court affirms the judgment of the trial court.

**Factual and Procedural Background**

Sharnique Jones gave birth to her daughter, S.J., on January 3, 2008. Between January 6 and March 21, 2008, Ms. Jones took S.J. to the hospital 12 times for a variety of health problems. Ms. Jones first brought S.J. to the hospital because S.J. was jaundiced, but doctors determined it was not at a level requiring treatment. She next brought S.J. to the emergency room, complaining that she had a fever and was not eating. S.J. did not have a fever when she was in the emergency room, and staff reported that S.J. ate well while at the hospital. Several days later, Ms. Jones brought S.J. to the hospital with a possible Zantac overdose.[1] According to Ms. Jones, a man who previously had raped her came into the house, grabbed S.J. and the Zantac, and locked himself and S.J. in the bathroom. After about 10 minutes, he came out of the bathroom and ran out of the house. S.J. had what looked like Zantac around her mouth and on her clothes, leading Ms. Jones to believe she was given a large dose of Zantac. The hospital performed a drug screen and other tests, all of which came back normal.

Over the next couple of months, Ms. Jones continued to bring S.J. to the hospital frequently because of other health concerns. Three times, she reported that S.J. was experiencing apnea, which occurs when a person stops breathing for more than 10 seconds. Overall, S.J. appeared healthy and had normal vital signs during her visits, but a pediatric neurologist observed that S.J. was experiencing seizures and, on two occasions, her seizures were confirmed by an EEG. The seizures were not life threatening, and S.J. was prescribed medication to control them.

---

[1] Zantac is a medication prescribed in liquid form to infants who have acid reflux.

During these visits, medical staff instructed Ms. Jones regarding proper feeding and safe sleeping practices for newborns. They also provided her with information about community resources available to new mothers. Ms. Jones was educated about safe sleeping practices again during a home visit with a social worker.

On April 7, 2008, Ms. Jones called 911, informing the operator that she had laid S.J. in a bassinet and later found her not breathing. Pine Lawn Police Chief Rickey Collins was the first to arrive at the scene, and he performed CPR on S.J. until the paramedics arrived. The paramedics were unable to resuscitate S.J., and she was pronounced dead at the hospital. Dr. Ariel Goldschmidt, a doctor working on a fellowship in the St. Louis medical examiner's office, initially determined S.J.'s cause of death to be death by natural causes from a seizure disorder. He determined the cause of death based on Ms. Jones' statements to the investigator from the medical examiner's office and S.J.'s medical history because there was no other cause of death apparent from the physical autopsy or the toxicology and laboratory reports. The chief medical examiner, Dr. Michael Graham, signed the death certificate with that determination.

Ms. Jones gave birth to a son, D.W., on January 18, 2009. Two days later, Ms. Jones brought D.W. to the hospital, reporting that he was jaundiced. The hospital admitted D.W. for malnutrition, lethargy, and marginal dehydration. Ms. Jones reported that D.W. was not waking himself up to feed and that he did not want to eat at home. He was receiving only 80 calories a day but needed between 250 and 275 calories per day. The hospital put D.W.

on a feeding program using a nasogastric tube to drip formula directly into his stomach.[2] Ms. Jones became upset with the feeding program and accused hospital staff of force-feeding D.W. She checked D.W. out of the hospital against medical advice. During this visit, Ms. Jones had been instructed about proper feeding.

Three days later, Ms. Jones took D.W. to the hospital after reporting that he had stopped breathing while she was feeding him. Concerned because of S.J.'s history, doctors performed an extensive neurological workup on D.W. but were unable to determine the cause of the reported apnea. The medical staff believed, however, that Ms. Jones was continuing to underfeed D.W., and they made multiple attempts to talk to her about the amount of formula D.W. needed. They referred D.W.'s case to the state children's division, which took protective custody of D.W. After he gained enough weight, the hospital discharged him into the care of a foster parent. He continued to gain weight while in her care.

Detective Harolton Clayborn investigated the nutritional neglect of D.W. Ms. Jones agreed to talk to him about D.W. at police headquarters, and she signed a *Miranda*[3] rights warning and waiver form. Ms. Jones told Detective Clayborn that she had missed several feedings while D.W. was in her custody. With regard to D.W.'s second hospitalization, she admitted that she had been burping D.W. on her lap when he stopping breathing. She had diverted her attention to the television, and when she started paying attention to D.W. again,

---

[2] Because D.W. was malnourished, he would tire easily from sucking and would not want to feed. The tube allowed him to receive the nutrition that he needed but was too weak to get on his own. By feeding more, D.W. would gain strength, which would allow him to feed eventually without the tube.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

he was face down in a burp rag. She noticed that D.W. was not breathing and that his face was blue. When Detective Clayborn told her he did not believe she was telling the whole truth, Ms. Jones told him that D.W. was actually lying face down in the burp rag before she noticed that his face was blue.

During her interview, Ms. Jones told Detective Clayborn that she was scared when the incident with D.W. occurred because she had lost S.J. about a year before. Detective Clayborn was concerned that Ms. Jones had another child who had died at home after being found not breathing, and he questioned Ms. Jones about S.J.'s death. Ms. Jones stated that, on the day S.J. died, she had been trying to get S.J. to stop crying but that she was getting frustrated "to the point where [she] felt like harming [herself] or [S.J.]." Ms. Jones admitted that she laid S.J. on the bed with her face in the pillow, not thinking twice about what would happen to herself or S.J. She then went downstairs to look for pills to commit suicide but changed her mind after some family members came home. Ms. Jones thought about S.J. and went back upstairs about 15 to 20 minutes later, and she found S.J. lying on the bed, not breathing. Police notified Dr. Graham about Ms. Jones' statements regarding S.J.'s death and asked that he review the case. Dr. Graham reviewed S.J's autopsy report, considering Ms. Jones' statement that she placed S.J.'s face in a pillow, and determined the cause of death to be suffocation. He amended the death certificate accordingly.

The state charged Ms. Jones with second degree murder for causing the death of S.J. by suffocation, first degree endangering the welfare of a child by acting in a manner that created a substantial risk to the life and health of D.W., and first degree assault for knowingly causing serious physical injury to D.W. After a trial, the jury found her guilty of

5

second degree murder, first degree endangering the welfare of a child, and the lesser included offense of second degree assault. The trial court sentenced Ms. Jones to concurrent sentences of 15 years for murder and seven years each for endangering the welfare of a child and assault. Ms. Jones appealed. On its own motion as authorized in article V, section 10 of the Missouri Constitution, the court of appeals transferred the case to this Court after opinion.

### *Corpus Delicti* **Established**

In her fourth point on appeal, Ms. Jones argues the trial court plainly erred in admitting her out-of-court statements as substantive evidence of second-degree murder because the state failed to prove the *corpus delicti* of the offense. As Ms. Jones admits, this point may be reviewed only for plain error because she failed to raise this objection to the trial court.[4] Rule 30.20; *State v. Letica*, 356 S.W.3d 157, 167 (Mo. banc 2011). Because Ms. Jones' statements were considered by the jury as evidence of her guilt, and, therefore, will be considered when reviewing her claim that there was insufficient evidence presented to convict her of second-degree murder, this Court first must address her claim that the trial court should not have admitted her statements.

"'The plain error rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review.'" *Letica*, 356 S.W.3d at 167. This Court will exercise its discretion to conduct plain error review only when the appellant's request for plain error review establishes facially substantial grounds for believing that the trial court's error was "evident, obvious, and clear" and "that manifest

---

[4] Ms. Jones filed a motion in limine to exclude her statements, but it was on the basis that they were not made voluntarily. The trial court overruled the motion.

6

injustice or miscarriage of justice has resulted." *State v. Baumruk*, 280 S.W.3d 600, 607

(Mo. banc 2009) (internal quotations omitted). Unless the appellant makes this facial

showing, this Court will decline to review for plain error under Rule 30.20. *State v. Brown*,

902 S.W.2d 278, 284 (Mo. banc 1995).[5]

"[O]ut-of-court confessions, statements, or admissions by the accused are generally

not admissible unless they are corroborated by independent evidence, either circumstantial

or direct, showing the *corpus delicti* of the crime." *State v. Edwards*, 116 S.W.3d 511, 544

(Mo. banc 2003). In a homicide case, *corpus delicti* requires proof of the death of the victim

and evidence that the criminal agency of another person caused the death. *Id.* As discussed

by this Court in *State v. Madorie*, the *corpus delicti* rule does not require a high level of

proof:

---

[5] *See, e.g.*, *State v. Fassero*, 256 S.W.3d 109, 117 & n.3 (Mo. banc 2008) (declining to grant plain error review regarding a claim under article I, section 19 of the Missouri Constitution with respect to the timing of the defendant's second trial); *State v. Cella*, 32 S.W.3d 114, 117 (Mo. banc 2000) (declining to grant plain error review regarding a claim that a law included more than one subject in violation of article III, section 23 of the Missouri Constitution); *State v. Johnson*, 968 S.W.2d 123, 132 (Mo. banc 1998) (declining to undertake plain error review regarding allegedly improper comments by the prosecutor and alleged errors in admitting evidence); *State v. Simmons*, 944 S.W.2d 165, 177 (Mo. banc 1997) (quoting *Brown* and declining to grant plain error review regarding admission of testimony); *State v. Clemons*, 946 S.W.2d 206, 224 (Mo. banc 1997) (quoting *Brown* and declining to grant plain error review over all claims not objected to at trial or not raised in a motion for new trial); *State v. Hudgins*, 612 S.W.2d 769, 770 (Mo. 1981) (declining to grant plain error review of all of the defendant's claims in a death penalty case when the defendant deliberately and intentionally failed to file a motion for new trial); *State v. Scott*, 487 S.W.2d 528, 530 (Mo. 1972) (declining to grant plain error review with respect to admission of testimony); *State v. Turner*, 458 S.W.2d 280, 281 (Mo. 1970) (declining to grant plain error review with respect to admission of exhibits into evidence); *State v. Chaney*, 967 S.W.2d 47, 59 (Mo. banc 1998) (declining to grant plain error review of a prosecutor's allegedly improper statements during closing argument); *State v. Nicklasson*, 967 S.W.2d 596, 615 (Mo. banc 1998) (same); *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997) (same); *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995) (same); *State v. Williams*, 423 S.W.2d 736, 738 (Mo. 1968) (same).

[A]bsolute proof independent of [a defendant's] statement or confession that a crime was committed is not required. All that is required is evidence of circumstances tending to prove the corpus delicti corresponding with the confession. *Slight corroborating facts* are sufficient to establish the corpus delicti. The determination of whether there is sufficient independent evidence of the corpus delicti of an offense is fact specific and requires a case-by-case evaluation.

***

The State is only required to prove that someone committed the crime with [i]ndependent evidence of circumstances which correspond and interrelate with the circumstances described in the statement or confession.

156 S.W.3d 351, 355-56 (Mo. banc 2005) (internal quotations and citations omitted). Uncorroborated statements that were improperly admitted into evidence are insufficient to sustain a conviction. *State v. Summers*, 362 S.W.2d 537, 542 (Mo. 1962).

Here, Ms. Jones has not established facially substantial grounds for believing that admitting her statements to police at trial was an "evident, obvious, and clear" error or that it caused "manifest injustice or a miscarriage of justice." *Baumruk*, 280 S.W.3d at 607. Ms. Jones's appellate brief to this Court, which sets forth her *corpus delicti* claim, concedes the following facts from evidence presented at trial: Chief Collins, the first to arrive at the scene, testified that he found S.J. lying on a twin size bed near the pillows; a bassinet was in the room as well; Chief Collins observed that Ms. Jones' demeanor was not consistent with someone who just lost a child – he observed her to be "very calm;" Ms. Jones' own expert witness (a forensic pathologist) testified that S.J. died while lying face down; after Ms. Jones's admission, the medical examiner amended S.J.'s death certificate to list the

8

cause of death as a "homicide" by suffocation;[6] the pediatric neurologist who treated S.J. testified that it is "decidedly uncommon" for an infant of S.J.'s age to die from a seizure and that S.J.'s seizure disorder was not life threatening; and, on previous occasions, hospital medical staff and a children's division worker had instructed Ms. Jones about safe sleeping practices for a newborn – infants need to sleep in their own crib, bassinet, or infant bed on their backs with no pillows or blankets near their heads.

Because these corroborating facts were in the record, Ms. Jones has failed to establish facially substantial grounds for believing that it was an evident, obvious, and clear error to admit her statements and that manifest injustice or a miscarriage of justice has occurred. Therefore, this Court declines to review for plain error. *Baumruk*, 280 S.W.3d at 607-08; *Brown*, 902 S.W.2d at 284.

### Sufficiency of the Evidence

Ms. Jones challenges the sufficiency of the evidence to support her convictions for second degree murder, first degree endangering the welfare of a child, and second degree assault. This Court's review "is limited to a determination of whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Moore*, 303 S.W.3d 515, 519 (Mo. banc 2010) (internal quotations omitted). This Court will not weigh the evidence but accepts as true all evidence

---

[6] Ms. Jones contends the medical examiner's conclusion that S.J.'s death was a homicide cannot be used to establish the *corpus delicti* because he changed the cause of death based on Ms. Jones' out-of-court confession. She cites no law that a change in a death certificate based on a defendant's out-of-court confession cannot be used to corroborate the confession for purposes of proving the *corpus delicti*. On the contrary, an out-of-court confession may enable the discovery of corroborating evidence. *State v. McQuinn*, 235 S.W.2d 396, 297 (Mo. 1951).

and reasonable inferences supporting the conviction and ignores all contrary evidence and inferences. *Id.*

## Sufficient Evidence of Second-Degree Murder

Mother first argues the state failed to prove that she knew or was aware that her conduct was practically certain to cause S.J.'s death. To obtain a conviction of second degree murder, the state must prove that a defendant knowingly caused the death of another person. *See* section 565.021.1.[7] A person acts knowingly when "he is aware that his conduct is practically certain to cause" a result. Section 562.016.3. *See also State v. Thomas*, 161 S.W.3d 377, 380 (Mo. banc 2005). Intent often is proved by circumstantial evidence and "may be inferred from surrounding facts or the act itself." *State v. Oliver*, 293 S.W.3d 437, 446 (Mo. banc 2009).

In Ms. Jones' case, the state presented evidence from which a reasonable juror could find beyond a reasonable doubt that Ms. Jones was aware that laying S.J. on her stomach with her face in a pillow was practically certain to cause S.J.'s death. The state offered testimony showing that Ms. Jones was counseled on safe sleep practices. During S.J.'s visit to the hospital on January 16, 2008, medical staff explained to Ms. Jones that infants need to be in their own bed, whether in a crib, a bassinet or an infant bed, that they needed to be put on their backs, and that there should not be pillows and blankets around them. During a home visit on March 14, 2008, a social worker informed Ms. Jones that newborn infants need to sleep in a crib on their backs with no other belongings in the crib and that blankets should not be placed near the infant's head. At the time, S.J. was lying on a couch with a

---

[7] All statutory references are to RSMo Supp. 2012, unless otherwise indicated.

fleece blanket. The social worker showed Ms. Jones how S.J. could move her head into the blanket and explained that S.J. would be smothered. The social worker testified that Ms. Jones appeared to appreciate the concern with suffocation. From this evidence, a reasonable juror could find that Ms. Jones understood that S.J. would suffocate if she were left on her stomach with her face in a pillow.

The jury also heard Ms. Jones' statement to Detective Clayborn, in which she said that she was feeling "overwhelmed" and "frustrated" by S.J.'s constant crying on the day S.J. died. She stated that she tried to get S.J. to stop crying by feeding her, changing her diaper and clothes, giving her a bath, rocking her, and putting her in her swing. She confessed that she eventually became frustrated to the point that she felt like harming herself or S.J. Ms. Jones then placed S.J. on her stomach with her face in a pillow on an adult bed while S.J. was crying. She went downstairs, planning to commit suicide, and "didn't think twice about what was going to happen to [S.J.] or [herself]." She left S.J. lying on her stomach on the bed with her face in a pillow for at least 15 or 20 minutes. Reasonable jurors could conclude from Ms. Jones' statement that she laid S.J. with her face in the pillow knowing that S.J. would suffocate after becoming so frustrated with S.J.'s crying that she wanted to harm her. Additionally, the length of time that Ms. Jones stated she left S.J. on the bed also infers that she acted knowingly. Fifteen to 20 minutes is a considerable amount of time, considering the warnings Ms. Jones had been given regarding the risk of suffocation when placing an infant on her stomach with her face in a pillow. Yet, she did not check on S.J. sooner.

Further, Ms. Jones' conduct after finding S.J. raises an inference that she acted knowingly. When Ms. Jones' called 911, she reported that she had placed S.J. in the bassinet and came back to find her not breathing. She later admitted that she had placed S.J. on the adult bed. Ms. Jones' false statement that she placed S.J. in the bassinet demonstrates a consciousness of guilt and supports a guilty verdict. *See State v. Rodden*, 728 S.W.2d 212, 219 (Mo. banc 1987). There was also testimony that Ms. Jones' demeanor when first responders arrived was "pretty calm" and was not that of a mother who just lost her child. Reasonable jurors could infer that Ms. Jones was not acting like a mother who just lost a child because she knowingly caused her child's death.

Ms. Jones points to the initial determination that S.J. died of a seizure disorder and evidence of the numerous times she took S.J. to the hospital, arguing it shows that she was a young mother seeking medical care for her child. Ms. Jones' argument ignores the standard of review. In reviewing the sufficiency of the evidence, this Court disregards any evidence and inferences contrary to the verdict. *State v. Miller*, 372 S.W.3d 455, 463 (Mo. banc 2012). Great deference is given to the jury's verdict, and this Court will not act as a "super juror." *Id.* In reviewing the evidence in a light favorable to the guilty verdict, it is clear that the state presented sufficient evidence from which a reasonable juror could conclude that Ms. Jones was aware that laying S.J. on her stomach with her face in a pillow was practically certain to cause her death. Therefore, Ms. Jones' claim fails.

**Sufficient Evidence of First-Degree Endangering the Welfare of a Child**

Next, Ms. Jones asserts that there was insufficient evidence to support her conviction of first degree endangering the welfare of a child because the state failed to prove she acted

12

knowingly. A person commits the offense of first degree child endangerment when the person "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." Section 568.045.1. A person acts knowingly when the person is aware that his or her conduct is "practically certain to cause that result." Section 562.016.3. In a prosecution for first-degree child endangerment, it is not required that the defendant be aware that the resulting harm was practically certain; rather, the state must prove the practical certainty of the *risk* of harm. *State v. Davis*, 407 S.W.3d 721, 725 (Mo. App. 2013). Knowledge may be proven "by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident." *State v. Burrell*, 160 S.W.3d 798, 802 (Mo. banc 2005).

In this case, there is sufficient evidence from which a reasonable juror could find that Ms. Jones knew that her conduct created a substantial risk to D.W. D.W. was admitted to the hospital on January 20, 2009, for malnutrition, lethargy, and marginal dehydration. Ms. Jones told hospital staff that she was having a hard time feeding D.W. at home and that she was feeding him only 80 calories a day, which is much less than the 250-275 calories a day that he needed. She later admitted that she had missed six feedings on January 19 and 20 before taking D.W. to the hospital. On January 23, Ms. Jones took D.W. home against medical advice because she believed the hospital was force-feeding him after being warned by medical staff that taking D.W. home put him at a risk for dehydration, starvation, neurological disorders, or death.

While D.W. was in the hospital, medical staff educated Ms. Jones about proper feeding and how much formula D.W. needed. Nonetheless, Ms. Jones continued to miss

13

D.W's feedings at home; she missed five feedings on January 25 and 26. While she took D.W. back to the hospital on January 30 for an unrelated reason, hospital staff were concerned that Ms. Jones was still under-feeding him, and D.W. was placed in protective custody.

When Ms. Jones took D.W. out of the hospital against medical advice, she was aware that her conduct was putting D.W.'s health and life at serious risk because the medical staff informed her about the serious health risks. Furthermore, she continued to miss his feedings at home, despite knowing D.W. was malnourished and being informed about how to feed him properly. Ms. Jones argues that she took D.W. out of the hospital because she believed the hospital was force-feeding D.W. with the nasogastric tube, which she believed to be wrong.[8] Her belief about the feeding program, nevertheless, does not negate the fact that she was aware of the risks when she brought D.W. home against medical advice. She admitted when interviewed by Detective Clayborn that she felt overwhelmed and was sleeping, so she would not feed him every three hours as directed but, instead, would feed him only when he cried. This evidence was sufficient for a reasonable juror to find that Ms. Jones knowingly created a substantial risk to D.W.'s life and health when she removed him from the hospital against medical advice and continued to miss his feedings at home.

---

[8]The record is clear that the feeding program was the reason why Ms. Jones checked D.W. out of the hospital, but it also shows that she was not always so against the nasogastric tube feeding program. Hospital records indicate that when staff tried to wake up Ms. Jones so that she could feed D.W., she wanted him to be fed with the nasogastric tube or she wanted a nurse to feed him. She did not want to feed him herself.

**Sufficient Evidence of Second-Degree Assault**

Finally, Ms. Jones asserts there was insufficient evidence to support her conviction of second-degree assault. A person commits second degree assault if that person "[r]ecklessly causes serious physical injury to another person." Section 565.060. "A person 'acts recklessly' . . . when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Section 562.016.4. Ms. Jones contests whether the state sufficiently proved she acted recklessly.

The state presented Ms. Jones' statement that she was burping D.W. on her lap with his face to the side and a burp rag in her hand. She diverted her attention to the television, and when she looked back at D.W., his face was in the burp rag and he was not breathing. She also stated that his face had turned blue. Additionally, the evidence demonstrated that Ms. Jones was aware of the dangers of leaving an infant face down on a soft object, such as a pillow or a blanket, because she already had lost a child to suffocation due to being placed face down in a pillow.

Ms. Jones claims that, at best, the evidence shows negligence or carelessness, rather than a conscious disregard of a substantial and unjustifiable risk. Her argument suggests that she was distracted inadvertently by the television. Such a finding, however, requires an inference that is contrary to the jury's verdict, which this Court must disregard under its standard of review. Rather, a reasonable inference from Ms. Jones's statement that supports the verdict is that Ms. Jones consciously stopped paying attention to her newborn infant

15

lying on her lap to watch television. By her own admission, the burp rag was in her hand; yet she claimed not to notice that D.W. was pressing his face into the rag with sufficient pressure to cut off his breathing. Moreover, Ms. Jones stated that D.W.'s face was blue by the time she noticed he was not breathing, and the state produced expert testimony that a child who is suffocating would not change colors until the child's breathing is restricted for at least a minute or longer. A reasonable juror could find from the evidence that Ms. Jones consciously disregarded the risk of suffocation when she placed D.W. on her lap with his face near a burp rag and ignored him for a period of time long enough for him to stop breathing and turn blue.

## Conclusion

Because the state's evidence corroborated that S.J. died as a result of criminal agency, Ms. Jones failed to establish facially substantial grounds for believing that it was evident, obvious, and clear error to admit her statements and that manifest injustice or a miscarriage of justice has occurred. Therefore, the Court declines to review for plain error. Further, Ms. Jones' challenges to her convictions of second degree murder, first degree endangering the welfare of a child, and second degree assault also fail. Construing all inferences in favor of the verdict, the record contains sufficient evidence from which a reasonable juror could find Ms. Jones possessed the requisite intent for each of those offenses. Accordingly, this Court affirms the trial court's judgment.

_____
PATRICIA BRECKENRIDGE, JUDGE

All concur.

16