

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED112724 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | the City of St. Louis |
| vs. | ) | Cause No. 2322-CR01183-01 |
| | ) | |
| LITEL GILMORE, | ) | Honorable Scott A. Millikan |
| | ) | |
| Appellant. | ) | Filed: June 24, 2025 |

### Introduction

Litel Gilmore ("Defendant") appeals the circuit court's judgment after a jury found him guilty of three counts of first-degree statutory sodomy, two counts of first-degree statutory rape, and tampering with a witness. Defendant raises two points on appeal. In Point I, Defendant argues the circuit court plainly erred by violating his due process and confrontation rights when admitting S.C.'s ("Victim") out-of-court statements made during a forensic interview. In Point II, Defendant argues the circuit court plainly erred by violating section 491.075.1 when admitting these same statements.[1] This Court holds Defendant waived his constitutional confrontation claim because he did not raise it at the earliest possible opportunity. Even if this claim were not waived, it lacks merit. Point I is denied. This Court further holds Victim's out-of-court statements had sufficient

---

[1] All statutory references are to RSMo 2016.

indicia of reliability presented at the Chapter 491 hearing, and the circuit court did not plainly err in admitting them at trial. Point II is denied. The circuit court's judgment is affirmed.

## Factual and Procedural History

Because Defendant does not challenge the sufficiency of the evidence to support his convictions, the facts viewed in the light most favorable to the judgment are:

In November 2017, Victim was ten years old when she disclosed to her math teacher that Defendant—whom she believed was her father—had touched her inappropriately when she was eight or nine years old. Defendant was incarcerated when Victim disclosed the touching. The day after her disclosure, Tammy Hackworth ("Hackworth"), a Children's Division investigator, interviewed Victim at her school. Victim told Hackworth her dad "touched her inappropriately" but she did not go into detail about what she meant. Victim told Hackworth she was asleep when he touched her. When she woke up, Defendant was running from the room. Hackworth contacted law enforcement, and the matter was assigned to Detective George Henry ("Detective").

*December 2017 CAC Interview*

In December 2017, shortly after Victim turned eleven, Detective scheduled a forensic interview at the Child Advocacy Center ("CAC") for Victim. On December 12, 2017, Victim posted on social media:[2]

> Okay, everybody…. it's time to speak up…Its a time in my life where I was raped by someone who i thought was my biological dad but turns out to be hes my stepdad and this happened in 2015 and my mom was at work and she worked from 3pm-12pm and i was asleep and i felt some touching all over my body and i said stopp and i didnt see nothing and then the second time he came in i seen that he was naked and i said im telling mt moma when get here and he said if you tell anybody im gone kill you yo momma and yo sister and i said im not telling now can u leave me alone and he stopped and then it started all over again for then whole 2015 and half of 2016 but he got in jail for some i dont know and he calls me all the time asking me do i want to go to a hotel when he get out and turn my phone on do not disturb and have sex with me and he want me to have his baby[.]

---

[2] The spelling, punctuation, and syntax are quoted directly from the social media post.

On December 19, 2017, Beverly Tucker ("Tucker"), a CAC forensic interviewer with twenty-two years' experience, interviewed Victim, while Hackworth and Detective observed from a separate room. Victim told Tucker something had happened to her. She told two friends, wrote down what happened, and gave the paper to her math teacher. Victim said she wrote about something Defendant did "more than once" when she was "multiple ages" but she was nine years old the last time something happened. Victim did not elaborate further. Because Victim made no substantial disclosures during this interview, the case was "inactivated."

In September 2018, Defendant was released from incarceration. In October 2018, Victim called 911 and told the dispatcher her mother was with "a man who had raped [her] before" and she did not feel safe. Victim stated Defendant raped her "two or three years ago." The 911 call prompted Detective to reactivate his investigation, and he scheduled another CAC interview with Tucker.

*January 2019 CAC Interview*

After being removed from her mother's care, Victim had a second CAC interview with Tucker in January 2019. Victim told Tucker she came to talk about "child sexual abuse" because "that's what happened to me." Victim said this happened "more than once."

Victim told Tucker about the "worst" time when Defendant called her in from outside where she was playing with her siblings, took her into his bedroom, had her get on the bed, and told her to undress. Defendant also undressed, turned on the television which played some "gross stuff," and told Victim to do what she saw on the television. Victim did not want to describe what was on the television because it was "nasty," but said people were undressed. Tucker asked Victim what she had to do, but Victim would only say it was "nasty." Tucker asked Victim if it would be easier for her to write it down. Victim agreed and wrote, "The first thing was to put his middle

3

part in my mouth, then he put his middle part inside of me (he forced it in)[.]" When Victim would not explain what she meant by "middle part," Tucker showed Victim anatomical drawings and asked her to circle or mark the "middle part" on the male and female. On the male drawing, Victim placed an "X" over the penis, and Tucker wrote, "middle part" with an arrow pointing to the penis. On the female drawing, Victim circled the vagina, and Tucker wrote "middle part" with an arrow pointing to the vagina. Victim stated once Defendant told her to say she loved him when he "had his middle part up in [her]." Victim said it hurt. Victim also said Defendant kept saying he was going to "come" but she did not know what that meant. Afterwards, Defendant told her to brush her teeth. Tucker asked if Victim used the bathroom. Victim said yes. Tucker asked, "I'm wondering if you noticed anything different when you used the bathroom." Victim initially responded, "Yeah, I guess." Victim hesitated to answer, but she asked Tucker if she could write it down. Tucker gave her back the paper and Victim wrote, "When I was using the bathroom my middle part was burning." Victim said she was in second grade when this happened.

Tucker asked Victim, "Did something like that happen another time?" Victim responded, "Yeah, but it wasn't that bad." Tucker responded, "Tell me what happened another time." Victim explained she was asleep and wearing a My Little Pony nightgown and underwear. Defendant came into her bedroom, pulled up her nightgown, pulled down her underwear, and put his fingers in her "middle part." Victim also described an incident in which Defendant told her to come into his bedroom while her mother was asleep, go into their walk-in closet, keep the door cracked, and watch. Victim said Defendant started doing "grown up people stuff" with her mother, and she heard the bed squeaking.

Victim then described the first time Defendant "did it" when she was seven or eight years old. Defendant told her he "was practicing on being a doctor." Defendant came into her bedroom

4

while she was asleep, woke her up, pulled down her shorts and underwear, and used his cellular phone as a flashlight to see her "middle part." Then he put two fingers "in."

Victim described another incident in which she was in her brother's room when Defendant put his "middle part" in her "middle part." Victim said Defendant asked her how it felt and if she loved him, but she said nothing. Tucker asked Victim, "Did something ever come out of [Defendant's] middle part?" Victim answered, "White stuff." Tucker asked, "Tell me about the white stuff." Victim said, "It was on the floor …. He would say 'I'm about to come' … and it would get on the floor." Tucker asked Victim if she saw the "white stuff" and Victim said, "it looked like glue." Victim stated Defendant "would clean it up with a towel and throw the towel in the trash."

Defendant was arrested and charged with three counts of first-degree statutory sodomy and two counts of first-degree statutory rape. Defendant was incarcerated pretrial.

*2022 Witness Tampering*

In November 2022, Defendant spoke with his biological daughter, Annette Hudson ("Hudson"), via text message. Defendant told Hudson to direct Victim to make a statement she "lied on Daddy because she was mad at him because [she] thought he was going to get out of jail and whoop [her] for being bad because [she] was acting up" which Defendant stated would "free[ him] up God willing next week." On November 23, 2022, Hudson and Victim smoked marijuana before Hudson recorded Victim making two statements recanting the allegations. In the first audio recording, Victim stated she lied because she was mad at Defendant, and she thought "he was gonna get out of jail and whoop [her] for being bad cause [she] was acting up." After Hudson texted Defendant the audio recording, he responded, "Do it with the face because that could be anybody so do it with her face. That will not work." Defendant again directed Hudson

5

to have Victim say, "Just say daddy none of that stuff never happened I was just scared he was going to whoop me because I was being bad while he was locked up."  In the second recorded statement with her face visible, Victim said she "lied on Daddy because [she] was getting in trouble and [she] was scared that he was gonna give [her] a whooping when he got home."  That evening, Hudson sent Victim two payments totaling $60 via Cash App, a digital payment application. Victim later received four payments totaling $110 via Cash App from Defendant.

The next day, Victim exchanged text messages with a friend stating, "in my childhood my daddy raped me for years …."  Victim explained to her friend that Hudson "got [her] high yesterday so they can manipulate [her]."  Victim shared screenshots of the text messages between Defendant and Hudson.  Victim's friend asked, "So who was [in the] text?  Your sister and dad," to which Victim responded, "Yes.  [H]e telling her what to tell me to say so she can record me." Defendant was charged with tampering with a witness for this conduct.

*Chapter 491 Hearing*

The State filed its notice of intent to admit Victim's statements from both CAC interviews, the 911 call, and Victim's social media post under section 491.075.  At the hearing the day before trial, both CAC interview recordings, Victim's social media post, and the 911 call were admitted. Hackworth testified about conducting Victim's cursory interview, referring the case to Detective, and observing the December 2017 CAC interview.  Anthony Harper ("Harper"), a CAC senior forensic interviewer, testified about the Child First protocol, which is a nationally-recognized research-informed methodology used to interview children who have disclosed abuse.  Harper testified about his experience, supervision, and training when using this protocol, and his experience training others to use this protocol.  Harper explained the protocol requires interviewers to "ask questions on a continuum from open-ended questions where [they] are relying on free recall

6

from the child to provide a narrative response." He further explained interviewers used "cue-recall questions where [they] may take something a child had stated previously and go back to that and ask for additional information. There are times when multiple choice questions are used; yes, no, questions." Harper stated when a child responds to open-ended questions, "that is considered the most reliable information … [b]ecause all of the information is coming from the child. There is no suggestibility or anything like that involved in the question." Harper testified he has conducted over 1,700 interviews, and it was not uncommon for children not to disclose everything that happened to them at a single interview. Harper explained Tucker retired after working for the CAC for twenty-two years. Harper testified he observed both CAC interviews Tucker conducted and stated she followed the Child First protocol. At the hearing's conclusion, the circuit court determined because Victim "is a vulnerable person per statute, and based upon the testimony and the court's own review and observation of the two CAC interviews" Victim's interviews were reliable and would be admitted.

*Trial Testimony*

At trial, both CAC interviews, the 911 call, Victim's social media post, the anatomical drawings, Victim's written statements during the January 2019 CAC interview, the text message exchange between Victim and her friend, Victim's recorded recantations, and the Cash App transaction summaries were admitted without objection. Hackworth and Harper testified consistently with their pretrial hearing testimony. Detective testified about the sexual abuse and tampering investigations.

Victim testified she went to the CAC more than once because she "told [her] school" about "the thing that happened with [Defendant]." Victim said something happened "more than once" from when she was "four to nine or ten" years old. Victim testified she wrote the social media

7

post and confirmed "it was something that happened with [Defendant]." Victim explained she made the 911 call "[b]ecause [she] wasn't feeling safe" since her "mom was bringing [Defendant] around and [Victim] told her what he did to [her] …." Victim confirmed she marked the anatomical drawings and wrote the statements at the January 2019 CAC interview. Victim testified more extensively about how Defendant and Hudson worked to obtain her recantations and how she made the recordings in exchange for money, which she received via Cash App.

Defendant testified on his own behalf. He explained Victim was like a daughter to him, and he was the "disciplinarian" when she misbehaved. Defendant denied the sexual abuse and social media post allegations. Defendant denied directing Hudson to secure Victim's recantation or paying her because he claimed he did not have access to a tablet or cellular phone while incarcerated to text or send electronic payments. Defendant offered several jail telephone call recordings into evidence to demonstrate none of the calls were sexual in nature.

The jury returned guilty verdicts on all counts. Defendant was sentenced as a prior and persistent offender to consecutive life sentences on all five sexual offense counts and ten years' imprisonment for tampering with a witness, to run consecutively to the sexual offense sentences.

This appeal follows. Additional facts will be adduced in this Court's analysis to avoid repetition.

**Standard of Review**

Defendant concedes both of his points are not preserved for appeal because he did not object to Victim's January 2019 CAC interview statements being admitted at trial for any reason nor did he include these claims in his motion for new trial. *State v. Ivey*, 427 S.W.3d 854, 857 (Mo. App. W.D. 2014). Hence, this Court may only review his claims for plain error. *State v. Boyd*, 659 S.W.3d 914, 926 (Mo. banc 2023); Rule 30.20. Plain error review is a two-step process.

First, this Court must determine whether the circuit court's error was facially "evident, obvious, and clear." *State v. Wood*, 580 S.W.3d 566, 579 (Mo. banc 2019) (quoting *State v. Jones*, 427 S.W.3d 191, 195 (Mo. banc 2014)). Second, if the appellant "establishes a facially 'evident, obvious, and clear' error, then this Court will consider whether the error resulted in a manifest injustice or miscarriage of justice." *Id.* This Court will address Defendant's points out of order for ease of analysis.

## Discussion

### *Point II: Section 491.075 Statement Reliability*
### *Party Positions*

In Point II, Defendant argues the circuit court plainly erred when it admitted Victim's January 2019 CAC interview statements in violation of section 491.075. Defendant argues under the totality of the circumstances test, Victim's statements were not reliable because: (1) the statements were not spontaneous; (2) the statements were made when she was exhausted, eager to please, and had a motive to fabricate; (3) Victim did not demonstrate unexpected knowledge of sexual subject matter for a twelve year old; (4) the statements were made over two years after the alleged offenses occurred; and (5) there was no evidence Tucker was qualified to conduct a forensic interview. The State argues substantial evidence supported the circuit court's ruling Victim's statements were admissible under section 491.075.

### *Analysis*

"Section 491.075 reflects a policy determination that in some child abuse cases the victim's out-of-court statements may possess sufficient probative value to contribute to the judicial process[.]" *State v. Ellis*, 701 S.W.3d 647, 656 (Mo. App. E.D. 2024) (quoting *State v. Tanner*, 220 S.W.3d 880, 885 (Mo. App. S.D. 2007)). "[I]ndeed, such statements may on occasion be *more* reliable than the child's testimony at trial, which may suffer distortion by the trauma of the

9

courtroom setting or become contaminated by contacts and influences prior to trial." *Tanner*, 220 S.W.3d at 885–86 (emphasis in original). Section 491.075 states:

> A statement made by a child under the age of fourteen … relating to an offense under chapter 565, 566, 568 or 573 … not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:
>
> The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
>
> The child or vulnerable person testifies at the proceedings[.]

Section 491.075.1(1)–(2)(a). Victim was twelve years old when the statements were made, the offenses arose under Chapters 566, her statements were likely otherwise inadmissible hearsay, and she testified at trial. Despite the circuit court holding a Chapter 491 hearing outside the jury's presence, Defendant argues Victim's statements were inadmissible because there were insufficient indicia of reliability presented regarding the time, content, and circumstances of her statements.

"To determine the reliability of a child's out-of-court statements for purposes of Section 491.075, we look to the totality of the circumstances." *State v. Rugen*, 708 S.W.3d 513, 525–26 (Mo. App. E.D. 2025) (quoting *State v. Ragland*, 494 S.W.3d 613, 623 (Mo. App. E.D. 2016)). This Court notes when discussing this point, Defendant cites evidence adduced at both the Chapter 491 hearing and at trial. Yet, when applying the totality of the circumstances test, "the only evidence to be considered is that adduced at the [Chapter 491] hearing." *State v. Sprinkle*, 122 S.W.3d 652, 661 (Mo. App. W.D. 2003); *see also State v. Lane*, 415 S.W.3d 740, 751 (Mo. App. S.D. 2013) (holding "[t]his observation is consistent with the express language used in section 491.075.1(1), that the out-of-court statements are admissible if '[t]he court finds, *in a hearing conducted outside the presence of the jury* that the time, content and circumstances of the

10

statement provide sufficient indicia of reliability [.]'") (emphasis in original); *Ellis*, 701 S.W.3d at 656.

This Court examines several non-exclusive factors in analyzing the totality of the circumstances, including: (1) spontaneity and consistent repetition of the allegations; (2) the declarant's mental state; (3) the lack of a motive to fabricate; (4) knowledge of subject matter unexpected of a child of similar age; (5) the lapse of time between when the acts occurred and when the victim reported them; and (6) the interviewer's technique. *Rugen*, 708 S.W.3d at 525–26. "The unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Id*. at 526 (quoting *Ragland*, 494 S.W.3d at 623). "Additionally, '[w]e have consistently emphasized that a lack of leading questions, pressure tactics, and excessive prompting are important factors in finding that minor victims' out-of-court statements are spontaneous and have sufficient indicia of reliability.'" *State v. Pendergraft*, 688 S.W.3d 762, 765 (Mo. App. W.D. 2024) (quoting *State v. Antle*, 670 S.W.3d 66, 71–72 (Mo. App. W.D. 2023)).

*A. Spontaneity & Consistent Repetition*

Defendant does not address the consistent repetition of Victim's statements of sexual abuse. Instead, Defendant argues Victim's statements were not spontaneous because they were all made in response to prompting questions or directives. "A [v]ictim's disclosures are not suspect simply because they were prompted by questioning about possible abuse during a forensic interview." *Antle*, 670 S.W.3d at 73. "The central questions with respect to spontaneity is 'whether the victim was prompted or pressured to make the disclosures or whether the victim freely volunteered them.'" *Ragland*, 494 S.W.3d at 624 (quoting *Sprinkle*, 122 S.W.3d at 662).

Harper testified Tucker followed the Child First protocol, which requires interviewers to "ask questions on a continuum from open-ended questions where [they] are relying on free recall from the child to provide a narrative response." He further explained interviewers used "cue-recall questions where [they] may take something a child had stated previously and go back to that and ask for additional information." The circuit court was entitled to rely on Harper's training, experience, and his professional assessment Tucker's interview technique was appropriate. *Antle*, 670 S.W.3d at 75. Further, upon reviewing the January 2019 CAC interview, this Court finds Tucker adhered to the Child First protocol as Harper described it and used a variety of open-ended and follow-up questions when speaking to Victim.

Defendant specifically points to Tucker's questions about whether Victim used the bathroom after Defendant raped her and the disclosure her "middle part was burning." Defendant claims when Victim did not want to speak about how she felt when using the bathroom "Tucker knowing a detail like this would bolster [Victim's] credibility, asked [Victim] to write it down. In this way … Tucker prompted [Victim] to say her middle part was burning. [Victim] did not freely volunteer this information."

Defendant mischaracterizes the sequence of events regarding this exchange. While Tucker did ask Victim if she noticed anything different when using the bathroom, Tucker did not ask Victim to write down any details. Although hesitant to speak aloud, it was Victim who asked if she could write down her answer and disclosed the burning. This exchange did not result from Tucker using pressure tactics or excessive prompting. This Court finds Victim's disclosures were spontaneous.

*B. Mental State*

Defendant argues Victim's mental state was "extremely relevant because she was exhausted, confused, and overwhelmed" when the interview occurred. Defendant contends Victim had a busy day at school, attended therapy before the interview, and "was exhausted during the interview and 'just trying to get it over with.'" Defendant also contends Victim was confused as to why she was there. Defendant further characterizes Victim as overwhelmed by Tucker "continually asking her to describe *more* instances of sexual abuse" when Victim simply "wanted to get it over with *so I don't have to come back here anymore*."

This Court's review of the January 2019 CAC interview refutes Defendant's characterization of Victim's demeanor and omits critical context to Victim's statements. This Court does not find Victim exhausted, confused, or overwhelmed during the interview. To the contrary, Victim was significantly more engaged and forthcoming in the January 2019 CAC interview than the December 2017 CAC interview in which she frequently remained quiet and declined to disclose any details of abuse or answer questions. Victim described her busy day but remained engaged as Tucker attempted to build rapport with her early in the interview. Nor did Victim appear confused about the purpose of the visit. Victim told Tucker she came to talk about "child sexual abuse" because "that's what happened to me."

The record refutes Defendant's argument "it seems [Victim] believed she was required to answer all of … Tucker's questions before she could leave, since, when asked why she finally decided to talk, [Victim] said she talked because she 'wanted to get it over with. I didn't want to keep coming back here to talk.'" But Defendant omits the next sentence, "Plus my therapist said before we get into our sessions she wanted me to do this so they don't say she told me to say this." Victim discussed how she did the interview with her therapist's encouragement, who wanted her

to speak about the abuse before they explored the topic in therapy. Additionally, during the December 2017 CAC interview, Victim answered far fewer questions from Tucker. When Tucker asked Victim if there was anything she could do to make Victim feel better about talking to her, Victim said, "no," and the interview concluded almost immediately after that exchange. Victim's initial interaction with Tucker demonstrates Victim knew she could terminate the interview without answering all of her questions.

As for being overwhelmed, there were times Victim was embarrassed or reluctant to discuss what occurred, but she never indicated she needed a break or wanted to stop the interview. Defendant takes Victim's statements she was "just trying to get it over with … so I don't have to come back here anymore" out of context. After Victim told Tucker she was there to talk about child sexual abuse which happened to her, Tucker asked her if she felt like she could talk or share this time. Victim said she wanted to "get it over with" because the last time she was there, she had her hands in her face and would not say anything. Yet, Victim did not appear nervous, distressed or overwhelmed during the interview. Although there were times Victim was embarrassed and upset about disclosing details, these emotions can support the reliability of her statements. *See Sprinkle*, 122 S.W.3d at 664 (finding "[i]n light of the evidence at the hearing that [the child victim] acted upset, embarrassed, angry, and shy when disclosing the abuse, her mental state during each disclosure supports the reliability of her statements."). Finally, a reasonable inference can be drawn Victim wanted to speak at the interview to "get it over with" so she could begin processing the trauma with her therapist. This Court find Victim's mental state did not negate the reliability of her statements.

*C. Lack of Motive to Fabricate*

Defendant argues Victim had motive to lie about the sexual abuse allegations. Defendant states Victim's "motive to fabricate was strong and can best be understood through her own words when she recorded herself recanting the allegations she made against [him]." Defendant also points to his trial testimony he was the "disciplinarian" and would punish Victim's bad behavior by taking away privileges and spanking her occasionally. Again, this Court is confined to considering evidence presented only at the Chapter 491 hearing. *Sprinkle*, 122 S.W.3d at 661. There was no evidence presented about Victim's recantations at the hearing, and Defendant's trial testimony came after the Chapter 491 hearing.[3]

Defendant maintains Victim had a motive to lie because she was angry after she found out he was not her biological father. Yet, Victim explained she did not discover Defendant was not her dad until "the police got involved" with this case. At that point, Victim had already disclosed "something happened" with Defendant to her math teacher, friends, and Hackworth, before the December 2017 CAC interview.

Defendant also argues Victim made the 911 call not to disclose abuse, but to have him returned to custody for good. When that did not occur, Defendant argues "[Victim] realized she would need to go back to the CAC and give … Tucker more details in order to make [him] go away for good." This Court finds this argument unpersuasive given Defendant's argument about Victim's mental state. Defendant urges this Court to believe Victim was overwhelmed and confused as to why she was at the CAC interview but also simultaneously plotting to fabricate allegations to return him to prison.

---

[3] When viewing the evidence in the light most favorable to the judgment, this Court finds Victim did not use "her own words" to "recant" the allegations. The evidence reflects the jury found Defendant, working with Hudson, directed and paid Victim to say certain words in a specific manner to secure the "recantation," which was witness tampering.

15

Victim consistently stated in her social media post, the 911 call, and at the January 2019 CAC interview that Defendant repeatedly sexually abused her. This Court finds there was little evidence at the hearing indicating Victim had a motive to fabricate the allegations. Further, section 491.075 contemplates the circuit court may reject or discount certain evidence, which it likely did here, because it must determine whether sufficient indicia of reliability exist.

*D. Knowledge of Sexual Subject Matter*

Defendant contends Victim did not demonstrate sexual knowledge beyond what is typical for a 12-year-old to know, contrary to what the State argued in its closing. Defendant further contends any sensory details Victim provided were only given in response to leading questions.

"In assessing content-reliability, courts should not place undue emphasis on the particular vocabulary used by a child, but must determine whether knowledge of the *subject matter* described by the child is unexpected of a child of similar age." *Ragland*, 494 S.W.3d at 625 (emphasis in original); *see also State v. Redman*, 916 S.W.2d 787, 792 (Mo. banc 1996). During closing argument, the prosecutor argued:

> Remember she said that on one occasion he said out loud I'm going to come. She said, I don't know what that means. She said that white stuff came out of his middle part that landed on the floor and looked like glue. Now, there is no reason for her to know something like that. That is information she should not have but she was able to describe it. Why, because it happened.

Defendant finds it incredulous a 12-year old girl with access to the internet would not know what "I'm about to come" means or would be unable to describe semen. Yet, testimony about Victim's internet access was adduced only during the trial, which this Court cannot consider. *Sprinkle*, 122 S.W.3d at 661.[4] Defendant also cites secondary sources describing minors' access to

---

[4] Even if Victim's internet access could be considered, there was no testimony adduced regarding the imposition or lack of restrictions on Victim's usage to insinuate she had been exposed to sexually graphic material. Defendant does not address his actions exposing Victim to inappropriate material on his television when he sexually assaulted her.

16

pornography on the internet to bolster his argument, none of which was presented at the hearing, and which undercut his argument. Defendant cites one source for the proposition "23% of youth aged 10-15 reported intentional exposure to X-rated materials." Conversely, that means 77% of youth have not had intentional exposure, which could include Victim. In essence, Defendant argues it is expected that sixth grade girls have intimate knowledge not only of the mechanics of oral and vaginal sexual intercourse, but the statements frequently uttered by men during these acts and the appearance of semen as well. Common sense, and Defendant's own sources, show otherwise.

Finally, Defendant argues the details Victim provided when he ejaculated were in response to leading questions. A review of Tucker's questioning refutes this argument. Tucker asked open-ended questions to determine if Defendant ejaculated, using the terms Victim provided, and what, if anything, happened afterwards. This Court finds Victim's statements demonstrated unexpected sexual knowledge for a child her age.

*E. Time between Acts and Disclosure*

Defendant argues Victim's substantive statements occurred over two years after the alleged sexual abuse occurred, which is long enough to cast doubt on her statements' reliability. While "there are many cases where the child told someone about the abuse shortly after it happened … there are also several cases where there was a more significant time lapse between the occurrence of the abuse and" the disclosure. *Sprinkle*, 122 S.W.3d at 665 (collecting cases). "Time is only one factor for the court to consider when determining reliability." *Id*. (quoting *State v. Tringl*, 848 S.W.2d 29, 32 (Mo. App. E.D. 1993)). "It is not always necessary that the child's statements occur at or near the time of the alleged abuse in order to be reliable." *N.J.K. v. Juv. Officer*, 139 S.W.3d 250, 257 (Mo. App. W.D. 2004).

17

While Defendant maintains Victim made no disclosures until the January 2019 CAC interview, there were other allegations made closer in time to the abuse adduced at the hearing. First, shortly before the December 2017 CAC interview, Victim posted on social media she "was raped by someone who [she] thought was her biological dad…" and she "felt him touching all over her body …." A week later at the December 2017 CAC interview, Victim said she shared what happened with her math teacher, which she repeated in the January 2019 CAC interview. Victim also disclosed Defendant raped her to the 911 dispatcher before the January 2019 CAC interview. All these disclosures were consistent with the more detailed disclosures Victim made at the January 2019 CAC interview. Finally, Harper provided uncontested testimony it was not uncommon for children not to disclose everything that has happened during a CAC interview. This Court finds the lapse of time between the abuse and Victim's disclosures did not undercut her statements' reliability.

*F. Interviewer Techniques*

Finally, Defendant contends Tucker's interview techniques rendered Victim's statements unreliable because there was no evidence presented Tucker was qualified to conduct this interview, trained in the Child First protocol, or followed the Child First protocol. Defendant further argues it was impossible for the circuit court to evaluate whether Tucker had prior knowledge of the allegations, which may have influenced the manner and content of her questioning.

Defendant's arguments ignore Missouri caselaw holding a forensic interviewer need not testify at a Chapter 491 hearing to establish a victim's out-of-court statements are reliable. "Section 491.075 does not expressly require the person conducting the interview of the child to testify at the [S]ection 491.075 hearing, but rather utilizes a general standard requiring a finding that the time, content and circumstances of the statement provide sufficient indicia of reliability."

18

*State v. Sanders*, 473 S.W.3d 675, 678 (Mo. App. S.D. 2015). In fact, no evidence about the forensic protocols and procedures are required for the circuit court to determine whether a victim's statements are reliable under the statute. *Pendergraft*, 688 S.W.3d at 767.

This Court finds Defendant's case more akin to *State v. Timbs*, 562 S.W.3d 404 (Mo. App. E.D. 2018). *Timbs* found sufficient indicia of reliability when "there was testimony from a CAC forensic interviewer regarding the procedure and protocol for interviewing children at the hearing. She testified the interview with [the victim] complied with such protocol." *Id*. at 408. As in *Timbs*, Harper, a senior CAC forensic interviewer, testified regarding the procedure and protocol for interviewing children using the Child First protocol and testified Tucker's interview complied. This Court finds Tucker's techniques did not negatively affect Victim's statements rendering them unreliable.

### G. Totality of the Circumstances

When examining the totality of the circumstances, this Court holds there was sufficient indicia of reliability under section 491.075 regarding the time, content, and circumstances of Victim's out-of-court statements made at the January 2019 CAC interview. The circuit court did not plainly err in admitting these statements at trial. Point II is denied.

### Point I: Right to Confrontation
### Party Positions

In Point I, Defendant argues the circuit court plainly erred by violating his rights to due process and confrontation when admitting Victim's statements from the January 2019 CAC interview. Defendant argues the credibility of Victim's out-of-court statements was premised on the veracity of Tucker's methodology because if her methodology was flawed, Victim's statements would be "worthless" to a jury. Hence, Defendant contends Tucker "became a witness against [him] when the State offered [Victim's] statements from the forensic interview into evidence for

19

their truth, but [he] was denied his constitutional right to cross-examine Tucker." The State argues the circuit court properly found the statements from the interview were admissible and did not violate his constitutional right to confront Tucker. The State also contends Tucker's questions were not testimonial or admitted for the truth of any matter.

*Analysis*

"To preserve a constitutional claim of error, the claim must be raised at the first opportunity with citation to specific constitutional sections." *State v. Conner*, 583 S.W.3d 102, 113 (Mo. App. E.D. 2019) (quoting *State v. Driskill*, 459 S.W.3d 412, 426 (Mo. banc 2015)). If a constitutional claim is not asserted at the first opportunity, it is waived and cannot be raised on appeal. *State v. McCoy*, 678 S.W.3d 125, 132 (Mo. App. E.D. 2023). Defendant has not preserved his constitutional claim for this Court's review because he has raised it for the first time on appeal; therefore, the claim is waived.

Even if Defendant's claim was not waived, this Court would find it lacks merit because it has been raised and rejected in *Sanders*. There, the defendant argued his confrontation rights were violated when the CAC interviewer who questioned his child sexual abuse victims was unavailable at the Chapter 491 hearing and the trial. *Sanders*, 473 S.W.3d at 679. *Sanders* recognized, "The Sixth Amendment to the United States Constitution provides in part that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ....'" *Id*. (quoting *Ohio v. Clark*, 576 U.S. 237, 243 (2015)). "Witnesses" has been defined as those "who bear testimony," and … "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id*. (quoting *Crawford v. Washington,* 541 U.S. 36, 51 (2004)).

The Southern District rejected the defendant's argument the forensic interviewer was a "witness against" him within the meaning of the Confrontation Clause, holding:

> To the contrary, the forensic interviewer was not a "witness against" [d]efendant because the interviewer's questions and statements during the interview were (1) not made for the purpose of proving any fact, (2) not used to establish the truth of any matter, and (3) not evidence of [d]efendant's guilt. The forensic interviewer had no personal knowledge of the offenses under investigation, and made no statements during the interview that were relevant in any way to the offenses under investigation or that were introduced to prove the truth of the matter asserted in the statement. The forensic interviewer's only role during the interview was to ask questions that allowed [the child victims] to tell what [they] knew about [d]efendant's conduct. [The child victims] were the witnesses against [d]efendant under the Confrontation Clause, not the person who interviewed [the child victims].
>
> Just as [d]efendant had no constitutional right to confront the prosecutors with respect to questions they asked witnesses at [his] trial, [he] had no constitutional right to confront the interviewer who asked [the child victims] questions in [their] forensic interviews.

*Id.* at 679–80. *See also McCoy*, 678 S.W.3d at 132 n.5 (Mo. App. E.D. 2023) (citing *Sanders* to find even if this Court reached the merits of the defendant's identical, unpreserved Confrontation Clause claim, it lacked merit).

Defendant argues *Sanders* was wrongly decided because "Tucker is a forensic practitioner just like a forensic scientist measuring blood alcohol or detecting cocaine, [and] when evidence she *produced* ([Victim's] statements) was used for its truth against [him, Defendant] became entitled to cross-examine her on the process by which she produced the evidence." (Emphasis in original). Defendant relies on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), and *Smith v. Arizona*, 602 U.S. 779 (2024), to support his position. In *Melendez-Diaz* and *Bullcoming*, the United States Supreme Court held the defendants had a right to confront the forensic analysts who performed testing or wrote a "testimonial certification." *Melendez-Diaz*, 557 U.S. at 308–10; *Bullcoming*, 564 U.S. at 663–65. In *Smith*, the United States Supreme Court held when an expert witness restated an absent laboratory

21

analyst's factual assertions to support his own opinion testimony, the defendant was entitled to confront the absent laboratory analyst if his or her factual assertions were testimonial in nature. *Smith*, 602 U.S. at 795–800.

Defendant creates a false equivalence between forensic child interviewers and other forensic analysts who perform scientific testing to produce evidence at trial. Notably, none of the United States Supreme Court cases involved forensic interviewers. Forensic child interviewers, much like prosecutors, have no personal knowledge and do not bear testimony because they do not make a solemn declaration or affirmation for the purposes of establishing or proving some fact as *Sanders* recognized.[5] By contrast, the primary purpose of a forensic analyst's report measuring blood alcohol or detecting cocaine is to admit the report for the truth of the matter asserted to prove a defendant's guilt. Accordingly, this Court finds these cases inapposite.

Here, Victim's statements, not Tucker's questions, formed the basis of proof to charge and convict Defendant. Victim testified and was available for cross-examination at trial. Defendant's right to confrontation was not violated when he was unable to cross-examine Tucker at trial. The circuit court did not plainly err in admitting Victim's statements from January 2019 CAC interview because his right to confrontation was not violated. Point I is denied.

### Conclusion

The circuit court's judgment is affirmed.

_____
Philip M. Hess, Presiding Judge

Gary M. Gaertner, Jr., J. and
Renée Hardin-Tammons, J. concur.

---

[5] Early in the January 2019 CAC interview, Victim asked Tucker if she had to provide details about what happened to her. Tucker told her yes so that she could "learn and understand [Victim's] experience," the reasonable inference being she had no personal knowledge of the allegations.

22